# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-2506[1]

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

FRANK DURAN,

*Defendant-Appellant*.

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 CR 757—**Ronald A. Guzman**, *Judge.*

_____

ARGUED APRIL 6, 2004—DECIDED MAY 10, 2005

_____


Before RIPPLE, KANNE and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. In December of 2002, a superseding indictment charged Frank Duran, and several others, with violations of various federal narcotics and firearms statutes. These charges arose out of a drug-distribution conspiracy in Chicago.

---

[1] This case originally was consolidated for purposes of briefing and disposition with *United States v. David Duran*, No. 03-2968. That consolidation has been vacated.

Mr. Duran was tried before a jury and was found guilty of all charges against him, including conspiracy to possess with the intent to distribute a controlled substance, *see* 21 U.S.C. §§ 841(a)(1) & 846; possession with the intent to distribute a controlled substance, *see* 21 U.S.C. § 841; possession of a firearm, "namely, a Beretta 9 mm semiautomatic handgun," in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A); and use of a communications facility to facilitate the commission of a narcotics offense, *see* 21 U.S.C. § 843(b). Mr. Duran has appealed his conviction and his sentence. We held this case in abeyance pending the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005). For the reasons set forth in the following opinion, we now affirm the judgment of conviction. However, in light of *Booker*, 125 S. Ct. 738, and this court's decision in *United States v. Paladino*, 401 F.3d 471, 2005 WL 435430 (7th Cir. Feb. 25, 2005), we order a limited remand of Mr. Duran's sentence.

# I

# BACKGROUND

## A. Facts

In January of 2001, the Federal Bureau of Investigation ("FBI") began an investigation into a Chicago drug ring after an informant alerted the FBI that Mr. Duran and others were distributing narcotics. Through wiretaps, controlled buys and informants, the Government was able to obtain a great deal of evidence about the conspiracy.

Mr. Duran decided to go to trial. His brother, David Duran, however, decided to plead guilty and to testify against his brother. A number of Mr. Duran's other cohorts, including Beatriz Gamez, Mr. Duran's long-time, live-in girlfriend and

the mother of his three children, as well as William Bertucci and Andrew DiPalma, also agreed to testify against Mr. Duran. At Mr. Duran's trial, the evidence consisted of recorded telephone conversations, testimony from law-enforcement agents, testimony from cooperating witnesses and physical evidence seized during searches following the arrests of the co-conspirators in 2001. The evidence was extensive, and we shall give only the broad outline.

Beginning no later than 1999 and continuing through 2001, David Duran obtained marijuana and cocaine from a number of drug suppliers, including Danny Galacia. These purchases from suppliers often were made on credit. David Duran's testimony and a recorded telephone conversation established that, at least on one occasion, Mr. Duran transported drugs and guns from Galacia's house in Texas to Chicago.

David would sell some of these drugs directly to his "own customers." David would also sell some to Mr. Duran and give some to Mr. Duran on credit, who dealt to his "own customers." David testified that either two to three times a week or a month, he would provide Mr. Duran with an eighth or a quarter kilo of cocaine so that Mr. Duran could service his customers. Also, "[w]hen it was in season," David would front Mr. Duran "on average" between "five and ten pounds" of marijuana "[m]aybe once or twice a week." Tr. at 551. Gamez, Mr. Duran's girlfriend, helped Mr. Duran service his customers. For example, once or twice a week in June and July of 2001, Gamez distributed drugs to Mr. Duran's customers. Also, Gamez testified, customers would come to their house to collect drugs and to make payments. Gamez testified regarding a journal she kept, in which she recorded the amounts owed to Mr. Duran by his customers. Gamez also would record when David took Mr. Duran's cocaine to cover a shortage for a customer.

DiPalma, who was cooperating with the FBI, made two controlled buys from Mr. Duran.

Evidence established that the brothers also worked in tandem. DiPalma testified he was able "to call either David or Mr. Duran for the cocaine" and if one was not available, he would call the other. Tr. at 25; *see also* Tr. at 26 (explaining that, "[i]n the last couple of years I would say I did more business with Frank, but generally, I would call one [brother], and if he didn't have the cocaine, I would call the other brother," and further explaining that, at times, David referred him (DiPalma) to Frank and vice versa). In addition, Mr. Duran also served as a drug delivery person for David. David testified that, at various times, Mr. Duran was delivering drugs "two to three times a week" for David for a fee; recorded telephone conversations regarding Mr. Duran's deliveries on behalf of David were introduced at trial. Tr. at 543. Bertucci, one of David's long-time customers, testified at trial that Mr. Duran delivered drugs to him on behalf of David on one occasion.

On June 4, 2001, David was stopped by Chicago Police Officer Walsh after Officer Walsh became aware that David was going to make a deal. Crack cocaine was found on the front seat of David's car, and David attempted to bribe Officer Walsh. As part of the investigation, Officer Walsh played along and ultimately got David to agree to give a cash bribe; the two met later and David paid the officer. In recorded telephone conversations between David and Mr. Duran introduced at trial, David told Mr. Duran about being stopped. He also told Mr. Duran that he needed to move drugs, and the two discussed utilizing a car that the police would not recognize. FBI Special Agent Melton testified about a different incident on June 19, 2001, when he stopped a truck that David was driving and found David with approximately $20,000 in cash. David told Agent

Melton that he owned the truck but that "the license plate on the vehicle belonged to his brother, Frank." Tr. at 778-79.

There was also a significant amount of evidence introduced about the role of the "Bat Cave" or "Eagle's Nest," an apartment located at 3743 South Damen. This location was utilized to advance the distribution activities. Gamez testified this was "an apartment that [Frank Duran] and his brother used to rent . . . to hold the drugs at." Tr. at 222. Gamez further testified that Mr. Duran would stay at the Bat Cave "a couple of time[s] a week or month" and explained that Mr. Duran told her that the brothers "needed to pretend that they lived there." Tr. at 298. Gamez testified she never went to this apartment and was not sure where it was. David testified that, among other purposes, this apartment was utilized to hide and store drugs and drug-dealing paraphernalia and to measure drugs. David specifically testified that Mr. Duran would leave him money in the apartment for drugs that David had given him. *See* Tr. at 554-55. David also testified that Mr. Duran had a key "[a]t times." Tr. at 555. When the police searched the Bat Cave, they uncovered cocaine, scales with white powder residue, a vitamin used to cut cocaine, a bulletproof vest, a flash suppressor and three weapons. One of the weapons that is particularly relevant to this appeal was a 9 mm semiautomatic pistol (the "Beretta") found in the pocket of a bathrobe hanging on the door in the apartment's bathroom. David testified that this weapon was his and that he kept it "[f]or protection." Tr. at 562. In addition to searching the Bat Cave, law enforcement searched Mr. Duran's house, David's house, where he lived with his girlfriend (1710 West Cermak), and David's sister's apartment, where David had stayed at different times. At these locations, they discovered drugs, drug-dealing paraphernalia and a number of other weapons and weapons accessories.

## B. District Court Proceedings

In January of 2003, Mr. Duran went to trial and was found guilty of all charges against him, including conspiracy to possess with the intent to distribute a controlled substance (Count 1), *see* 21 U.S.C. §§ 841(a)(1) & 846; possession with the intent to distribute a controlled substance (Counts 6 and 7), *see* 21 U.S.C. § 841; possession of a firearm, "namely, a Beretta 9mm semiautomatic handgun," in furtherance of a drug trafficking crime (Count 9), *see* 18 U.S.C. § 924(c)(1)(A); and use of a communications facility to facilitate the commission of a narcotics offense (Count 15), *see* 21 U.S.C. § 843(b).

Mr. Duran was sentenced to 262 months for Count 1, 240 months for Counts 6 and 7, and 8 months on Count 15, with the sentences to run concurrently. He also was sentenced to a consecutive 60-month sentence for Count 9.

# II

# DISCUSSION

Mr. Duran challenges various aspects of his conviction. These issues fall into four broad categories. We shall consider each in turn. Then we shall address Mr. Duran's challenge to his sentence.

## A. Evidentiary Challenges

Mr. Duran's first challenge is to the district court's admission of certain evidence. Our review of evidentiary decisions is limited. "We afford great deference to the trial court's determination of the admissibility of evidence because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of the judge's familiarity

with the case and ability to gauge the impact of the evidence in the context of the entire proceeding." *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998). This principle is reflected in our approach to appellate review of evidentiary submissions. If a timely objection at trial was made, we review the district court's ruling under an abuse of discretion standard. *See United States v. Wilson*, 237 F.3d 827, 834 (7th Cir. 2001). Even when we conclude that the court erred in its decision, "the court will grant a new trial only if the error had a 'substantial influence over the jury,' and the result reached was 'inconsistent with substantial justice.' " *United States v. Walton*, 217 F.3d 443, 449 (7th Cir. 2000) (citation omitted). However, much of the evidence Mr. Duran now challenges was not the subject of an objection at trial; in such a situation, our review is limited to searching for a plain error. *See United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir. 1988). To reverse under plain error review, we must find "(1) an error has occurred, (2) it was 'plain,' (3) it affected a substantial right of the defendant, and (4) it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Gibson*, 356 F.3d 761, 765 (7th Cir. 2004) (internal quotation marks and citations omitted); *see also* Fed. R. Crim. P. 52(b).

Mr. Duran identifies "eight categories" of admitted evidence that he claims were irrelevant, misleading or substantially more prejudicial than probative under Federal Rules of Evidence 402 and 403. Rule 402 instructs that all relevant evidence is admissible, but "[e]vidence which is not relevant is not admissible." Evidence is relevant if it has "some tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Liporace*, 133 F.3d 541, 544 (7th Cir. 1998) (internal quotation marks and citation omitted). Rule 403 further

explains: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "[M]ost evidence is, by its very nature, prejudicial, and that evidence must be unfairly prejudicial to be excluded." *United States v. Neeley*, 189 F.3d 670, 682 (7th Cir. 1999) (internal quotation marks and citation omitted). The eight categories of evidence that Mr. Duran claims should have been excluded are: (1) "evidence of David's attempt to bribe his way out of prosecution," (2) "Special Agent Melton's testimony regarding stopping David and finding him with more than $20,000 in cash," (3) certain evidence recovered at David's house (1710 West Cermak), (4) two firearms recovered at David's sister's residence, (5) evidence recovered from the Bat Cave, (6) the testimony of William Bertucci, (7) intercepted calls between David Duran and David Zuniga, and (8) matters testified to by David that have nothing to do with Mr. Duran. Appellant's Br. at 21-28.

Before delving into the details of each particular "category" of evidence, Mr. Duran's challenge is best considered globally. Mr. Duran's theme for this section of his argument is that "Frank did not get his day in court; he got David's." Appellant's Br. at 19. He framed the question presented to this court as follows: "Whether evidence of crimes committed by a co-conspirator outside the scope of the conspiracy so tainted the proceeding that substantial justice requires a new trial." Appellant's Br. at 2. At bottom, he believes these eight "categories" of evidence involving David were not connected to the conspiracy in which Mr. Duran was involved; it was David's drug dealing alone. Although Mr. Duran knew about David's dealings, he did not intend to join in *all* of David's individual activities. *See United States*

*v. Townsend*, 924 F.2d 1385, 1392 (7th Cir. 1991) (explaining that mere knowledge of illegality does not equate with agreement to join illegality). Thus, submits Mr. Duran, evidence of David's individual dealings—including dealing with his "own customers," bribing the police and keeping guns— were not relevant to any conspiracy in which Mr. Duran might have participated. In his view, permitting the jury considering his criminal liability to hear these accounts was prejudicial and rendered his trial fundamentally unfair.

We think that Mr. Duran's challenges fail to appreciate the breadth of conspiracy liability. "To join a conspiracy . . . is to join an agreement, rather than a group." *Id.* at 1390. "Proving a conspiracy under 21 U.S.C. § 846 requires that (1) two or more people agreed to commit an unlawful act and (2) the defendant knowingly and intentionally joined in that agreement. No overt act is required." *United States v. Thornton*, 197 F.3d 241, 254 (7th Cir. 1999). Once the defendant is established as a co-conspirator, "[t]he scope of [his] liability is determined by the scope of the agreement" among the co-conspirators. *United States v. Plescia*, 48 F.3d 1452, 1461 (7th Cir. 1995). "[W]here there is one agreement, a defendant who agrees to conspire will be held liable for those acts of co-conspirators that were in furtherance of the conspiracy." *United States v. Edwards*, 945 F.2d 1387, 1395 (7th Cir. 1991). This can be true even if the acts in furtherance of the conspiracy were committed before the defendant/co-conspirator joined the conspiracy, *see id.*; even if the defendant/co-conspirator did not know the person performing the acts that furthered the conspiracy, *see United States v. Monroe*, 73 F.3d 129, 132 (7th Cir. 1995); and, importantly to this case, even if the defendant/co-conspirator did not know specifically that the acts were going to be performed, *see United States v. Bullis*, 77 F.3d 1553, 1564 (7th Cir. 1996).

The primary limiting factor to this powerful principle of shared liability is that the act be "reasonably foreseeable" from the conspiratorial agreement. *Id.*

Mr. Duran's evidentiary challenges—and, indeed, much of his appeal—necessarily rest on the assumption that Mr. Duran participated in a narrow conspiracy that did not implicate David's activities in full. In this vein, Mr. Duran argues that, although Mr. Duran may have *known* of David's dealings, that is not sufficient to prove Mr. Duran *joined* a conspiracy encompassing those activities. *See United States v. Torres-Ramirez*, 213 F.3d 978, 982 (7th Cir. 2000) ("*Knowing* of a conspiracy differs from *joining* a conspiracy."). However, the evidence of record certainly supported the conclusion that Mr. Duran not only knew of but also had joined a very broad drug-dealing conspiracy in the Chicago area that encompassed David's activities as presented to the jury. The district court was on solid ground in permitting the jury to consider this evidence. Indeed, in telling fashion, Mr. Duran explicitly has disclaimed any challenge to the *sufficiency of the evidence* to establish the existence of the conspiracy or its scope. *See* Appellant's Br. at 20 n.1. Moreover, the jury instructions specifically presented the jury with Mr. Duran's theory that "[a] defendant's association with conspirators is not by itself sufficient to prove his participation or membership in a conspiracy," Tr. at 898, yet the jury still convicted.

To be sure, as Mr. Duran notes, David appears to have been the most active participant in the conspiracy. The fact that Mr. Duran's role was lesser than David's, however, does not negate or mitigate Mr. Duran's conspiratorial liability for David's acts. *See United States v. Almanza*, 225 F.3d 845, 846 (7th Cir. 2000) ("Anyone who agrees to join a criminal undertaking is a conspirator, and he is liable for all the criminal acts of the conspiracy that are foreseeable to him, regardless of how large or small his own role is. The

result is that a minor participant in a major conspiracy is potentially subject to very severe punishment." (citations omitted)). Mr. Duran notes that both he and David each technically had their "own customers," but there also was ample evidence to establish they worked in tandem in servicing each other's customers. Furthermore, the Government presented evidence that the two worked together to keep the drug-dealing conspiracy operating *generally*. For instance, they covered for each other when a brother could not serve adequately a customer. Mr. Duran also made deliveries for David. Because David and Mr. Duran were in a conspiracy to deal drugs in Chicago, any of David's activities that were reasonably foreseeable from that broad agreement were, as a matter of law, Mr. Duran's activities. Accordingly, they were directly relevant to Mr. Duran's case and their admission was not even error, much less abuse of discretion or plain error.

With these principles in mind, we turn to Mr. Duran's individual challenges. First, he contends that the "evidence of David's attempt to bribe his way out of prosecution" is "outside the scope of the conspiracy" in which Mr. Duran participated. Appellant's Br. at 21. The admission of this evidence was not objected to at trial. Therefore, our review is for plain error, and we can find none. In any conspiracy, it is reasonably foreseeable that co-conspirators will attempt to fend off law enforcement in order to keep the conspiracy going. *See United States v. Thompson*, 286 F.3d 950, 964 (7th Cir. 2002) ("[A] defendant may be held criminally responsible for any act committed in furtherance of the conspiracy, including acts taken to prevent apprehension."). This is what occurred here; the FBI was aware of the conspiracy, and David was trying to avoid apprehension. The fact that the drugs Officer Walsh located in David's car consisted of cooked crack cocaine and not powder cocaine also does not render David's efforts outside the conspiracy. First, although

the Government removed references to crack cocaine in the charges sent to the jury, there was evidence to establish that Mr. Duran was part of David's crack business as well. *See* Transcript 36[2] (Mr. Duran taking an order for crack cocaine). Further, it is unrealistic to believe that this bribery was an attempt by David "to avoid prosecution for a bag of crack cocaine the officer is holding right there, right then." Reply Br. at 8. David's own words tell the story; he called and told Mr. Duran the police had pulled him over and "you need to get away from that . . . right now and get over and talk to me." Transcript 15 at 2. After paying the bribe, David called Mr. Duran and told him that he recognized the officer as an officer who had been hanging around. *See* Transcript 17. Indeed, David noted that Mr. Duran had followed the officer at some point. *See id.* at 3 (David: "Remember the one that you were following the other day?" Frank: "Yeah, Yeah, Yeah."). Later that night, David called and told Mr. Duran that drugs needed to be moved and the two discussed finding a car that the police could not detect. *See* Transcript 18. The two met later that night. *See* Transcript 19. The district court acted well within its discretion in admitting the evidence and allowing the jury to decide that Mr. Duran was working with David to keep law enforcement from ending the drug-dealing ring. Finally, because David's effort to avoid apprehension was a reasonably foreseeable aspect of the conspiracy, it is irrelevant that "[n]o evidence indicated an agreement between David and Mr. Duran to pay this, or any, bribe." Appellant's Br. at 21. In short, David's attempt to avoid apprehension was part of the conspiracy in which Mr. Duran participated and was reasonably foresee-

---

[2] "Transcript" refers to the transcript of the recorded conversation entered into evidence at trial. Collectively, these transcripts are located at R.275.

able from that conspiracy; there was no error, much less plain error, in the admission of this evidence.[3]

Mr. Duran's second challenge is to "Special Agent Melton's testimony regarding stopping David and finding him with more than $20,000 in cash." Appellant's Br. at 22. Mr. Duran claims this evidence was irrelevant "as outside the scope of the conspiracy." *Id.* at 23. Because there was no objection to this evidence at trial, we review for plain error. We cannot find plain error. We have explained under similar facts that this type of "cash admitted into evidence [is] relevant" because it shows co-conspirators "were involved in a large-scale [drug] conspiracy." *United States v. Davis*, 838 F.2d 909, 921 (7th Cir. 1988). Even assuming, as Mr. Duran argues, that there is a possibility that the cash was attributable to some activities of David that were outside the conspiracy with Mr. Duran, we further have explained that the fact that one or both of the co-conspirators "were involved in other criminal activity that may have contributed to the amount of cash goes only to the weight, not the admissibility, of the evidence." *Id.*

Mr. Duran's third challenge is to the admission of the evidence recovered at David's house at 1710 West Cermak, including two firearms and a substantial amount of substance purported to be marijuana. Mr. Duran's challenge is based on relevance and undue prejudice. Mr. Duran objected to this evidence at trial; accordingly, our review is governed by the abuse of discretion standard.

---

[3] We note that in one of the transcripts relating to this attempt to avoid apprehension, Mr. Duran is heard punishing his daughters. That is certainly irrelevant, but, given its brevity in the transcript and its minor significance in the scheme of the overall evidence, the resulting prejudice, if any, does not concern us.

We cannot say the district court abused its discretion in determining that the guns were relevant. Nor can we say that the admission of this evidence caused undue prejudice. Part of the conspiracy was conducted out of David's house; this fact is clear not only from the evidence that law enforcement recovered there but also from evidence that showed *Mr. Duran* went to David's house and picked up a quarter kilo of cocaine to deliver for David. *See* Tr. at 544-45; *see also United States v. Nava-Salazar*, 30 F.3d 788, 798 (7th Cir. 1994) (upholding admission of drug-dealing evidence from one co-conspirator's house against other co-conspirators because the evidence was relevant to show the charged conspiracy). Specifically as to the firearms, we have explained that firearms "are recognized as tools of the drug trade; thus, courts have sustained the admission of weapons evidence in narcotics cases because the possession of a weapon is often a hallmark of drug trafficking." *United States v. Hubbard*, 61 F.3d 1261, 1270 (7th Cir. 1995). Ample testimony established the role of weapons in this conspiracy. *See* Tr. at 562 (David's testimony regarding keeping the Beretta for "protection"); *id.* at 564-65 (David's testimony that Danny Galacia had given guns to Mr. Duran); *id.* at 299, 304-05 (Gamez's testimony regarding Mr. Duran's gun, ammunition and silencer kept at their home). We also cannot say the probative value of this evidence was "substantially outweighed by the danger of *unfair* prejudice," Fed. R. Evid. 403 (emphasis added); Mr. Duran's contention "that the government introduced 'too much' relevant evidence" is without merit. *United States v. Neeley*, 189 F.3d 670, 683 (7th Cir. 1999).[4]

---

[4]  Mr. Duran also challenges the fact that the Government showed the weapons were *illegally* possessed. However, the jury is en-
(continued...)

The same analysis applies to Mr. Duran's overlapping fourth contention that the two guns recovered at David's sister's apartment should not have been admitted. However, having reviewed the parts of the record to which the Government has directed our attention, we find that the Government presented a dearth of evidence to connect David's sister's apartment and/or the guns found therein to the conspiracy. It appears that David stayed there at times. However, Mr. Duran's brief suggests the Government did not recover any drugs or drug paraphernalia from this residence, and the Government offers nothing to rebut that contention. Therefore, the guns' relevance is highly strained, and its probative value, if any, was substantially outweighed by its prejudice. Regardless, the erroneous admission of the two guns, when numerous others appropriately were admitted, could not have had a "substantial influence over the jury," and this evidence did not transform Mr. Duran's trial into one "inconsistent with substantial justice." *Walton*, 217 F.3d at 449 (internal quotation marks and citation omitted).

Mr. Duran's fifth objection—that all the evidence recovered from the Bat Cave should not have been admitted—was not made at trial, and, therefore, we review for plain error. The evidence from the Bat Cave was relevant and admissible for at least two reasons. First, the evidence revealed that the Bat Cave was headquarters of the conspir-

---

[4] (...continued)
titled to consider the legality of the possession in order to draw the inference that illegally possessed guns are more likely used for illegal purposes. *Cf. United States v. Castillo*, Nos. 02-3584 & 02-4344, 2005 WL 1023029, at *8 (7th Cir. May 3, 2005) (explaining, consistent with numerous circuits, that the status of the possession is one factor the jury can consider when deciding whether a gun was possessed "in furtherance of" a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A)).

acy in which David *and Mr. Duran* participated. *See, e.g.*, Tr. at 555-56 (David's testimony regarding how the Bat Cave was used by the brothers to exchange money for drugs). Thus, evidence regarding the apartment was relevant to help the jury understand the scope and nature of the conspiracy. *See United States v. Ramirez*, 45 F.3d 1096, 1102 (7th Cir. 1999). Second, as co-conspirators, Mr. Duran and David were jointly liable for the illegalities in the Bat Cave.

Mr. Duran's sixth and seventh challenges are to testimony of William Bertucci and taped conversations between David Duran and David Zuniga, respectively. No objections were made at trial, and, therefore, our review is for plain error. Basically, Mr. Duran's contention is that this evidence involved deals with David, not Mr. Duran. Again, however, Mr. Duran's argument misses that a co-conspirator (Mr. Duran) is liable for foreseeable acts of another co-conspirator (David), and it hardly can be argued that drug dealing is not a foreseeable act of a drug-dealing conspiracy.[5]

Mr. Duran's eighth challenge—that certain parts of David's testimony regarding drug-supplier Galacia should have been excluded—also must be reviewed for plain error and also is without merit. This evidence was quite relevant

---

[5] Mr. Duran also argues that the parts of the recorded conversations between David Zuniga and David Duran containing Zuniga's voice were hearsay not within Federal Rule of Evidence 801(d)(2)(E), the co-conspirator exception to the hearsay rule. This court, however, has held that a third-party's voice (here, David Zuniga's) on a taped conversation with a co-conspirator's (here, David Duran's) is necessary and admissible context to the co-conspirator's statements. *See United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002); *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989).

to the inner workings of the conspiracy of which Mr. Duran was a part. *See Ramirez*, 45 F.3d at 1102.

In sum, we are able to identify only one error of any magnitude in the admission of evidence: the admission of two guns uncovered at David's sister's apartment. Assessed against the backdrop of the evidence as a whole, the admission of this evidence could not have had a "substantial influence over the jury." *Walton*, 217 F.3d at 449 (internal quotation marks and citation omitted). Further, it is clear that Mr. Duran received a trial consistent with "substantial justice." *Id.* (internal quotation marks and citation omitted).

## B. Sufficiency of the Evidence Challenge to Count 9

Mr. Duran challenges the sufficiency of the evidence for his conviction for possession of a firearm in furtherance of a drug-trafficking crime. *See* 18 U.S.C. § 924(c)(1)(A). In adjudicating a sufficiency of the evidence challenge, this court "consider[s] the evidence in the light most favorable to the Government, defer[s] to the credibility determination of the jury, and overturn[s] a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999) (internal quotation marks and citation omitted). Legal questions presented as part of a sufficiency of the evidence challenge are reviewed de novo. *See United States v. Stott*, 245 F.3d 890, 904 (7th Cir. 2001).

Section 924(c)(1)(A) of Title 18 criminalizes the "possession" of a gun "in furtherance of" a drug-trafficking offense. In this case, the relevant gun charged in the indictment was the Beretta found in a robe in the bathroom of the Bat Cave. The evidence established that the gun was David's; therefore, Mr. Duran's liability is derivative of David's under co-

conspirator liability. *See United States v. Frazier*, 213 F.3d 409, 416 (7th Cir. 2000) ("[A] coconspirator may be held criminally liable for the foreseeable overt acts of others in furtherance of a conspiracy."). Mr. Duran concedes the "possession" element of § 924(c)(1)(A). Instead, he argues that the Beretta was not used "in furtherance of" the subject drug-trafficking crime: the drug-trafficking conspiracy.

Until recently, we had not addressed the "in furtherance of" element of § 924(c)(1)(A). However, in *United States v. Castillo*, Nos. 02-3584 & 02-4344, 2005 WL 1023029 (7th Cir. May 3, 2005), we explored this language in some detail, and the principles of *Castillo* control this case. The "in furtherance of" element requires that the weapon further, advance, move forward, promote or facilitate the drug-trafficking crime. *See id.* As numerous cases explain, the mere fact that a weapon is present at the scene of a drug crime is not enough to show a gun furthered a drug crime; there must be " 'a showing of some nexus between the firearm and the drug selling operation.' " *United States v. Gaston*, 357 F.3d 77, 83 (D.C. Cir. 2004) (quoting *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001)). One legal theory that has been advanced, and unanimously accepted, is that a possessed gun can forward a drug-trafficking offense by providing the dealer, his stash or his territory with protection. *See, e.g.*, *Castillo*, 2005 WL 1023029 at *7-11; *United States v. Luciano*, 329 F.3d 1, 6 (1st Cir. 2003). Of course, this type of possession-for-protection can be confused easily with circumstantial or innocent weapon possession; therefore, in cases such as this one, the evidence must specifically tie the weapon to the drug-dealing activity to ensure there was not "innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a cupboard." *Mackey*, 265 F.3d at 461. Factors that can be, but will not always be, useful in drawing this distinction include: "the type of drug

activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *United States v. Ceballos-Torres*, 218 F.3d 409, 414-15 (5th Cir.), *modified on denial of rehearing*, 226 F.3d 651 (5th Cir. 2000). At bottom, however, this is an arena where common sense must be our guide.

In this case, there was more than sufficient evidence to tie the subject weapon—the Beretta—to the drug-trafficking conspiracy and specifically to the protection of its owner, David. The Beretta was uncovered in the bathroom of the Bat Cave, conspiracy headquarters. It was within proximity of numerous rounds of ammunition. It was possessed illegally and was not registered. Also found in the apartment was cocaine, a bulletproof vest, a flash suppressor, two scales with white powder residue and a vitamin used to cut cocaine. It was "strategically located so that [it was] quickly and easily available for use." *Gaston*, 357 F.3d at 83 (internal quotation marks and citation omitted). Perhaps most importantly, David unequivocally testified that his purpose for having the Beretta was "[f]or protection." Tr. at 562. This case satisfies many of the *Ceballos-Torres* factors, and, given David's admission, it goes even further. Indeed, this case cannot be distinguished adequately from a number of well-reasoned holdings. *See, e.g., Luciano*, 329 F.3d at 6 ("Given the close proximity of the firearms and loaded magazines to the significant stockpile of heroin, we have no difficulty concluding that there was a sufficient nexus between the drug trafficking crime and the firearms to sustain a conviction under § 924(c)."); *United States v. Suarez*, 313 F.3d 1287, 1293 (11th Cir. 2002) ("[C]onsidering (1) the fact that Sicard's house was the major initial storage point of all the

cocaine brought in from Mexico; (2) the type, location, and condition of the weapons at issue; and (3) the amount of drugs to be stored in his house, the jury could reasonably have inferred that the guns were to be used to protect the conspirators' investment in their shipment."); *Ceballos-Torres*, 218 F.3d at 415 ("The weapon was loaded and easily accessible in Ceballos's apartment, and he confessed to ownership of the firearm. It was possessed illegally. And it was possessed in the apartment along with a substantial amount of drugs and money. Together, these factors reasonably support a finding that Ceballos's gun protected his drugs and money against robbery.").

Mr. Duran's argument that, as a matter of law, "[w]hen all that is shown is possession for 'protection,' . . . possession in furtherance of has not been established," Appellant's Br. at 35, simply must fail in light of the case law discussed above, which holds that jurors are entitled to consider that drug dealers possess guns for protection to further drug-trafficking offenses. *See, e.g.*, *Castillo*, 2005 WL 1023029 at *7-11. Of course, jurors certainly are entitled to find there was no evidence to establish that link between the particular gun at issue and the protection purpose, and, at times, the court of appeals must hold the evidence was insufficient to establish that link as a matter of law. *See United States v. Iiland*, 254 F.3d 1264, 1274 (10th Cir. 2001) (reversing "in furtherance of finding when "[t]here was no evidence that the gun and drugs were ever kept in the same place or that Mr. Iiland ever kept the gun accessible when conducting drug transactions"). However, we again refuse to hold that the protection theory is *legally* invalid because that would be inconsistent with § 924(c)(1)(A)'s "in furtherance of" language. A possessed gun surely can further a drug conspiracy by providing protection, and to hold otherwise would thwart

Congress' purpose of countering the dangerous mix of guns and drugs. *See Muscarello v. United States*, 524 U.S. 125, 132 (1998) (explaining § 924(c)(1)(A)'s purpose in these terms).

Mr. Duran also notes that there was no evidence of on-site sales at the Bat Cave and implicitly asks us to graft onto the "in furtherance of" element a requirement that sales be made at the place the gun is possessed. Like other circuits, however, we consider on-site sales a relevant consideration but not a prerequisite. *See Gaston*, 357 F.3d at 83 (finding "in furtherance of" element despite no mention of on-site sales); *Suarez*, 313 F.3d at 1293 (finding sufficient evidence that guns possessed at a drug "storage" house were possessed "in furtherance of"). Given the overwhelming nature of the other evidence in this case, neither this factor, nor the others to which Mr. Duran has pointed us, compel reversal.

As we did in *Castillo*, 2005 WL 1023029 at *5, 8, we empha-size that our role in this context is limited to ensuring that a valid legal theory supports the conviction and that there is some evidence from which a rational jury could find in favor of that legal theory. *See id.* The jury was entitled to rely on the protection theory, and, factually, there was over-whelming evidence, including David's own words, that protection was the purpose of the Beretta possession.[6]

---

[6] Mr. Duran also argues that David Duran's gun possession was not reasonably foreseeable from their conspiratorial agreement, and, thus, he cannot be liable for David's actions. *See United States v. Walls*, 225 F.3d 858, 865 (7th Cir. 2000). However, given the broad scope of this drug conspiracy and the ubiquitous presence of guns to support the conspiracy, the argument that it was not reasonably foreseeable that David would possess a gun in furth-erance of the conspiracy is without merit. *See United States v.*
(continued...)

Accordingly, we are unable to accept Mr. Duran's sufficiency of the evidence challenge.

## C.  Jury Instructions

Mr. Duran submits three distinct challenges to the jury instructions. We shall consider each below.

### 1.  "A Firearm" Error

Mr. Duran's first challenge is to the instructions regarding Count 9, the § 924(c)(1)(A) charge that we have addressed in the immediately preceding section. Although numerous weapons were introduced at trial as evidence, the superseding indictment based Count 9 on one weapon: the Beretta. Specifically, it alleged that Mr. Duran "possessed a firearm, namely, a Beretta 9 mm semi-automatic handgun, with removed serial numbers in furtherance of a drug trafficking crime, namely, conspiracy to distribute and possess with the intent to distribute cocaine, in violation of Title 21, United States Code, Section 846, as more fully described in Count One of this indictment." Superseding Indictment at 11. The jury instructions, however, explained that "[t]o sustain the charge of possessing a firearm in furtherance of a drug

---

[6]  (...continued)

*Sandoval-Curiel*, 50 F.3d 1389, 1393 (7th Cir. 1995). Mr. Duran also contends that David's possession "in furtherance of," if established, was outside the scope of any conspiracy in which Mr. Duran was a member. As we discussed earlier, this was a broad conspiracy, and the evidence was more than sufficient to establish that the Bat Cave, where the Beretta was stationed, was a central feature of the conspiracy including both David *and* Mr. Duran.

crime, as charged in Count 9, the government must prove . . . that the defendant knowingly possessed *a firearm* in furtherance of that crime." Tr. at 899 (emphasis added). It further explained that, "[w]hen the word 'firearm' is used in these instructions, it means any weapon that will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Tr. at 900.

Mr. Duran contends, and the Government concedes, that this invitation in the jury instructions to convict based on *any weapon* is a broadening of the weapon-specific indictment. A broadening of the indictment occurs when "the government . . . the court . . . or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998) (internal quotation marks and citation omitted). "Permitting an indictment to be constructively amended . . . violates the Fifth Amendment, which states in pertinent part that '[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.'" *United States v. Folks*, 236 F.3d 384, 391 (7th Cir. 2001) (quoting U.S. Const. amend. V).

We must decide whether this broadening of the indictment requires reversal. Mr. Duran did not object explicitly to the instructions' failure to identify specifically the Beretta; thus, our review is limited to searching for plain error. *See United States v. Trennell*, 290 F.3d 881, 886 (7th Cir. 2002) ("To assign error to any portion of the charge to the jury or omission therefrom a party must state 'distinctly the matter to which that party objects and the grounds of the objection' before the jury retires to consider its verdict." (quoting Fed. R. Crim. P. 30)); *see also* Fed. R. Crim. P. 52(b).

Mr. Duran first argues that this type of indictment broadening requires reversal per se. He relies on *United States v.*

*Pedigo*, 12 F.3d 618 (7th Cir. 1993), which explained in an analogous circumstance that broadening an indictment is "reversible per se. Therefore, if an amendment occurred, the plain error standard of review will not save the conviction." *Id.* at 631 (citation omitted). However, *Pedigo* is not the current law of this circuit. This court has explained that when, as here, the indictment is broadened based on non-specific jury instructions and when there was no objection to those jury instructions at trial, plain error review is appropriate. *See United States v. Algee*, 309 F.3d 1011, 1016 (7th Cir. 2002); *see also Cusimano*, 148 F.3d at 828 n.3 (explaining that, when plain error review is necessary, reversal per se is not warranted and collecting cases).

This court's decision in *Algee* is controlling. In *Algee*,

Count 3 of the superseding indictment charged Algee with knowingly possessing, after having previously been convicted of a felony, a firearm, "*that is* a Norinco, model SKS, 7.62 caliber, semi-automatic rifle, and a Harrington and Richardson, model 'Victor,' .22 caliber revolver." At trial, however, evidence of five firearms, including the two listed in the superseding indictment, were introduced. Further, the jury was instructed that it had to conclude only that Algee "knowingly possessed *a* firearm" to find him guilty on the count.

309 F.3d at 1015. The court began its review by explaining that, "[b]ecause Algee forfeited the issue" by failing to object, "he had to establish not only that there was error and that it was plain, but also that the error affected 'substantial rights.'" *Id.* at 1016; *see also United States v. Harbin*, 250 F.3d 532, 543 (7th Cir. 2001) (explaining that an effect on substantial rights generally is equated with prejudice); *United States v. Raney*, 342 F.3d 551, 559-60 (7th Cir. 2003) ("We will reverse a conviction under plain-error review only where it

is necessary to avoid a miscarriage of justice, and there is no miscarriage of justice if the defendant's guilt is so clear that he would certainly have been convicted even if the error had never been committed." (internal quotation marks and citation omitted)); *United States v. Baker*, 78 F.3d 1241, 1246 (7th Cir. 1996) ("[T]here is no plain error if a properly instructed jury nevertheless would have convicted [the defendant]."). The court in *Algee* then went on to explain that Algee had not even attempted to meet *his burden* of establishing prejudice, "[a]nd it is unlikely that Algee could have established prejudice in any case. As the government points out, *there was an abundance of evidence proving that Algee did knowingly possess the two firearms specifically listed in the superseding indictment.*" *Algee*, 309 F.3d at 1016 (emphasis added).

Although *Algee* involved a different statutory provision, the felon-in-possession statute, there is no reason why its principle should not control this case. As our discussion relating to the sufficiency of the evidence reveals, there also "was an abundance of evidence proving that" the Beretta was possessed in furtherance of the drug-trafficking conspiracy. *Id.* Accordingly, Mr. Duran has not met his burden of proving that his substantial rights have been affected, and we must uphold his conviction.[7]

---

[7] Mr. Duran argued in his opening brief that reversal was per se because the indictment was broadened, and, in the alternative, he argued that, under plain error review, reversal was warranted because "but for the error [in the instructions], Mr. Duran probably would have been acquitted." Appellant's Br. at 44. As explained above, we cannot accept this argument.

At oral argument, however, a different constitutional argument based on jury unanimity was discussed: whether, because we cannot be certain the jury decided unanimously that the Beretta
(continued...)

### 2. *Ceballos-Torres* Factors in Instruction

Mr. Duran next argues that the jury instructions on the "in furtherance of" element of the § 924(c)(1)(A) charge in Count 9 were erroneous, confusing and warrant reversal. "Jury instructions are viewed as a whole and '[i]f the instructions are adequately supported by the record and are fair and accurate summaries of the law, the instructions will not be disturbed on appeal.' " *Folks*, 236 F.3d at 388-89 (citation omitted).

The relevant portion of the instructions stated:

> Possession of a firearm is in furtherance of a drug-trafficking crime if the possession assists in furthering, advancing or helping the drug-trafficking crime.

---

[7] (...continued)
(as opposed to some other weapon) was possessed in furtherance of the drug-trafficking crime, remand is required. Presumably, this argument would be based on the Sixth Amendment requirement that a jury find a defendant "guilty," and the Due Process Clause's demand that a jury must find all elements of an offense beyond a reasonable doubt. We use the term "presumably" because this jury unanimity argument was not raised with any clarity in Mr. Duran's opening brief, and, accordingly, it is waived. *See United States v. South*, 28 F.3d 619, 629 (7th Cir. 1994) ("Perfunctory and undeveloped arguments . . . are waived."). In any event, we note that the jury unanimity argument is fundamentally at odds with *United States v. Algee*, 309 F.3d 1011 (7th Cir. 2002), where the conviction was affirmed based on the defendant's failure to show prejudice (i.e., but for the error, the defendant would have been acquitted), even though this court could not be certain the jury unanimously focused on the weapons identified in the indictment in the conviction. *See id.* at 1016. It also is at odds with previous constructive amendment cases. *See, e.g., United States v. Remsza*, 77 F.3d 1039, 1043-44 (7th Cir. 1996).

The mere presence of a firearm at a location is not sufficient to find that the firearm was possessed in furtherance of a drug-trafficking crime but can be considered along with other factors. Some factors that you may consider in determining whether a firearm possession was in furtherance of a drug-trafficking crime include but are not limited to, [1] the type of firearm, [2] whether the firearm was stolen, [3] whether the firearm possession was legitimate or illegal, [4] whether the firearm was loaded, [5] the accessibility of the firearm, [6] the proximity of the firearm to drugs, drug profits or materials used for drug trafficking, [7] the type of drug activity that is being conducted, and [8] the time and circumstances under which the firearm was found.

Tr. at 900. The eight factors listed are taken from *Ceballos-Torres*, 218 F.3d at 414-15. Mr. Duran argues that "[t]he *Ceballos-Torres* factors take the jury in the wrong direction. The key inquiry should be the relationship between the firearm and the drug activity. Neither the nature of the drug activity nor the legality of possession of the firearm alone are relevant to whether a firearm is used in furtherance. Thus, factors 1, 2, 3, 4, and 7 are misleading and not probative to the connection between possession and drug trafficking that the statute demands." Appellant's Br. at 45.

A number of circuits, including this one, have adopted the *Ceballos-Torres* factors, or a substantially similar list, as *helpful* considerations in the "in furtherance of" calculus. *See Castillo*, 2005 WL 1023029, at *8; *United States v. Sparrow*, 371 F.3d 851, 853-54 (3d Cir. 2004); *Gaston*, 357 F.3d at 83; *Suarez*, 313 F.3d at 1293; *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002); *United States v. Basham*, 268 F.3d 1199, 1208 (10th Cir. 2001); *Mackey*, 265 F.3d at 462. However, we have cautioned, as did the Ninth Circuit recently, that these factors cannot form a "checklist" because this arena must be

governed by a common-sense inquiry into whether the gun and drug-trafficking offense have been tied together such that a jury could conclude the former was possessed to advance the latter. *See Castillo*, 2005 WL 1023029, at *8; *United States v. Krouse*, 370 F.3d 965, 968 (9th Cir. 2004).

The Count 9 instructions reflected this approach: They did not cast the *Ceballos-Torres* factors as a checklist but as "[s]ome" factors the jury "may consider" in its "in furtherance of" calculus. Moreover, we cannot accept the notion that these factors are inherently misleading or unhelpful. In cases such as this one, where the Government's "in furtherance of" theory is one of protection (i.e., the gun was possessed in furtherance of the conspiracy by protecting the drug dealer, his stash and/or his territory), the *Ceballos-Torres* factors Mr. Duran identifies, and the factors as a whole, can help the jury to distinguish between a gun possessed for reasons unrelated to drug-trafficking activity and one possessed "in furtherance of" that activity. For example, jurors are not required to ignore the common-sense notion that a drug dealer who possesses a sawed-off shotgun with the serial number filed off during the course of a drug-distribution conspiracy likely was not possessing the weapon for pheasant hunting or gun-collection shows. *See Suarez*, 313 F.3d at 1293 (explaining, in rejecting a sufficiency of the evidence challenge on the "in furtherance of" element, that "[t]wo of the firearms were illegally shortened" and "[n]one of the weapons was of a type typically used for legal purposes, such as hunting"). Moreover, jurors are entitled to consider that illegally possessed, loaded weapons at the headquarters of a drug-distribution conspiracy "strategically located so that [they were] quickly and easily available for use" are likely to be possessed as part of that conspiracy. *Gaston*, 357 F.3d at 83 (internal quotation marks and citation omitted). *But see Krouse*, 370 F.3d at 968.

Of course, in particular cases, the inferences flowing from the factors will be less forceful, and the defendant can attempt to rebut such inferences before the jury. Nevertheless, assigning proportionate weight, if any, to these factors is the province of the jury. *See Suarez*, 313 F.3d at 1293 (explaining that "[t]he jury rejected" the defendant's story that "he had legally purchased guns over several years as a collector" and "it was within its purview to do so"). We need to hold only that these factors are valid and can be used as part of the "in furtherance of" instructions, which we do.

Finally, we note that Mr. Duran's argument that the instructions erroneously focused on possession and the legitimacy of the possession is diminished further by the fact that, prior to the rendition of the *Ceballos-Torres* factors in the instructions, the jury was given a correct definition of "in furtherance of" and admonished that mere possession of a firearm at a drug scene is not enough. Given these factors, we hold the instructions, considered as a whole, were proper. In so holding, we join the Tenth Circuit, which approved almost identical instructions and rejected an almost identical challenge in *Basham*, 268 F.3d at 1207-08.

### 3. "Aspects" Instruction

Mr. Duran's final challenge is to the instructions on the conspiracy charge in Count 1. These instructions stated in relevant part:

> A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. To sustain the charge of conspiracy as charged in Count 1, the government must prove the following propositions beyond a reasonable doubt:
>
> First, that the conspiracy as charged in Count 1 existed, and, second, that the defendant knowingly be-

came a member of the conspiracy with an intention to further the conspiracy.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty of Count 1.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty of Count 1.

A conspiracy may be established even if its purpose was not accomplished.

Count 1 sets forth different aspects an [sic] of alleged agreement between the defendant and others. The government need not prove every aspect of the agreement alleged as part of the conspiracy charged in Count 1.

To be a member of the conspiracy, the defendant need not join at the beginning or know all members or the means by which its purpose was to be accomplished.

The government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and was a willing participant.

Tr. at 896-97.

Mr. Duran argues that these instructions were "likely to mislead the jury, implying a reduction in the standard of proof necessary to convict" and, accordingly, violated his due process rights. Appellant's Br. at 45-46 (citing, among other cases, *United States ex rel. Fleming v. Huch*, 924 F.2d 679 (7th Cir. 1991)). As we noted above, "[j]ury instructions are viewed as a whole and '[i]f the instructions are adequately supported by the record and are fair and accurate summa-

ries of the law, the instructions will not be disturbed on appeal.' " *Folks*, 236 F.3d at 388-89 (citation omitted).

We cannot say that the conspiracy instructions, taken as a whole, constitute reversible error. The jury unambiguously was instructed that it had to find the elements of conspiracy "beyond a reasonable doubt" and that, if any of the elements were not found "beyond a reasonable doubt," then the jury was to acquit. The subsequent admonition that "Count 1 sets forth different aspects an [sic] of alleged agreement between the defendant and others," and "[t]he government need not prove every aspect of the agreement alleged as part of the conspiracy charged in Count 1" does not, in our view, signal to a reasonable jury to ignore the prior "reasonable doubt" instruction.

Count 1 did state nine of what laypersons would reasonably and naturally consider "aspects" of an agreement. For example, paragraph 2 of Count 1 explained that it was "part of the conspiracy that defendants DAVID DURAN, FRANK DURAN, and DANIEL GALICIA, obtained wholesale quantities of cocaine and marijuana for distribution to others." Superseding Indictment at 2. Paragraph 5 explained that "[it] was further part of the conspiracy" that Vivian Reyes and Beatriz Gamez, David's and Mr. Duran's girlfriends, respectively, would assist in distributing the drugs. *Id.* None of these aspects needed to be proven in order to convict for conspiracy because "[p]roving a conspiracy under 21 U.S.C. § 846 requires that (1) two or more people agreed to commit an unlawful act and (2) the defendant knowingly and intentionally joined in that agreement. No overt act is required." *United States v. Thornton*, 197 F.3d 241, 254 (7th Cir. 1999). Accordingly, it was appropriate for the instructions to make this point, and, in the process of so doing, we do not think the jury would have thought that this "aspects" instruction, in face of the reasonable doubt

instructions, meant that it did not have to find the elements of a conspiracy beyond a reasonable doubt. To take the view Mr. Duran suggests, we would have to believe that the jury could have thought that the district court was telling it not to do what the district court specifically and explicitly told it to do just sentences earlier.

### 4. Sentencing

Mr. Duran submits that his sentence violates the Sixth Amendment, as interpreted by the Supreme Court's recent decision in *United States v. Booker*, 125 S. Ct. 738 (2005). He points out that the sentence, imposed under the then-mandatory federal sentencing guidelines, exceeds the maximum authorized by the facts found by the jury or admitted by him. Because Mr. Duran did not raise this type of argument in the district court, our review is for plain error. *See Booker*, 125 S. Ct. at 769; *United States v. Paladino*, 401 F.3d 471, 2005 WL 435430, at *7 (7th Cir. Feb. 25, 2005).

Under the plain error test, "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' " *United States v. Cotton*, 535 U.S. 625, 631 (2002) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)). " 'If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (quoting *Johnson*, 520 U.S. at 467).

A jury found Mr. Duran guilty of all charges against him: conspiracy to possess with the intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) & 846 (Count 1); two counts of possession with the intent to distribute a controlled substance, in violation of 21 U.S.C.

§ 841 (Counts 6 and 7); possession of a firearm in further-ance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 9); and use of a communications facil-ity to facilitate the commission of a narcotics offense, in violation of 21 U.S.C. § 843(b) (Count 15). By special verdict, the jury found that the amount of drugs involved in the conspiracy was at least five kilograms of cocaine. R.188 at 3.

Based on the jury's drug amount finding, Mr. Duran's base offense level was 32. *See* U.S.S.G. § 2D1.1(c)(4). An offense level of 32 and Mr. Duran's criminal history category of V corresponded to a guidelines sentencing range of 188 to 235 months. The district court increased the base offense level by three levels based on its finding, not the jury's, that Mr. Duran had acted as a manager or supervisor in criminal activity involving five or more participants, U.S.S.G. § 3B1.1(b). The final adjusted offense level resulted in an applicable guidelines sentencing range of 262 to 327 months. The dis-trict court sentenced Mr. Duran to 262 months on Count 1, to 240 months on Counts 6 and 7, and to 8 months on Count 15, with the sentences to run concurrently. As required by 18 U.S.C. § 924(c)(1)(A), the district court also imposed a consecutive sentence of 60 months on Count 9.

The Government concedes that, in light of *Booker*, there was error and that the error is obvious. However, the Government maintains that the enhancement of Mr. Duran's sentence does not amount to plain error because Mr. Duran cannot demonstrate that the error affected the outcome of the dis-trict court proceedings. On this record, the district court, vested with the broader discretion now afforded by *Booker*'s remedial holding, might well have imposed a lighter sen-tence than required by the guidelines; we simply cannot be certain. Therefore, to enable us to complete our plain error analysis, we shall retain jurisdiction of this appeal and direct a limited remand, in accordance with our circuit's

recent decision in *Paladino*, 401 F.3d 471, 2005 WL 435430, at *10, to permit the sentencing court to determine whether or not it would have imposed the same sentence had it known that the guidelines were merely advisory.

### Conclusion

For the foregoing reasons, we affirm the judgment of conviction and order a limited remand of the sentence consistent with the procedure outlined in *Paladino*, 401 F.3d 471, 2005 WL 435430, at *10.

IT IS SO ORDERED

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*