[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 3, 2002
THOMAS K. KAHN
CLERK

_____

Nos. 00-15294 and 00-15940

_____

D.C. Docket No. 99-00866-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANCISCO SUAREZ,
a.k.a. Wilson Rosario, etc.
OMAR SUAREZ,
a.k.a. Alison Monteblanco, et al.

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Southern District of Florida

_____

**(December 3, 2002)**

Before TJOFLAT and BARKETT, Circuit Judges, and WEINER[*], District Judge.

BARKETT, Circuit Judge:

Co-appellants Francisco Suarez, Omar Suarez, Luis Fernando Sicard, and

_____

[*]Honorable Charles R. Weiner, U.S. District Judge for the Eastern District of
Pennsylvania, sitting by designation.

Anibal Avila appeal their convictions and sentences after a jury found them guilty at a joint trial. All appellants were convicted of one count of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. Sicard was also convicted of one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

The evidence at trial was built around the testimony of informant Nelson Murillo, a carpenter who built "stashes" – secret compartments designed to hide drugs in houses and motor homes – in South Florida and throughout the country for a drug trafficking organization led by Francisco Suarez and Umberto Ruiz. Murillo testified that, because of feelings of guilt regarding his role in the drug trade, he voluntarily walked into the DEA's office to confess his involvement with the drug conspirators in this case. Murillo was not under investigation, and the record suggests that the DEA knew nothing of the defendants' activities before Murillo's confession. Murillo admitted at trial that, in exchange for his cooperation, the government had agreed not to prosecute him and to pay his living expenses during trial. Shortly before trial, the government granted him a reward of $250,000. He also stated that the government afforded his girlfriend immunity from prosecution as a result of his informant work.

In addition to Murillo's detailed testimony, we discuss the testimony of two

undercover DEA agents Murillo "recruited" as drivers, tape recordings of the participants to the conspiracy, and physical evidence including firearms, narcotics, and the stash compartments themselves.

**CONVICTION ISSUES**

I.     **Whether the evidence supported the one conspiracy alleged in the indictment**

All of the defendants argue on appeal that the evidence presented at trial showed the existence of at least two separate conspiracies  –  one of which existed between Ruiz and Murillo, with no involvement on the part of the defendants – rather than the single conspiracy charged in the indictment.

Reversal is warranted if a single conspiracy is charged in the indictment but multiple conspiracies are proven at trial, and if the variance was material and substantially prejudiced the defendants. United States v. Alred, 144 F.3d 1405, 1414 (11th Cir. 1998). The arguable existence of multiple conspiracies, however, does not constitute a material variance from the indictment if, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found that a single conspiracy existed beyond a reasonable doubt. Id. To determine whether a jury could have found that a single conspiracy existed, this Court reviews (1) whether a common goal existed, (2) the nature of the underlying scheme, and (3) whether the participants of the alleged multiple schemes

3

overlapped.  See United States v. Calderon, 127 F.3d 1314, 1327 (11th Cir. 1997).

In this case, the evidence, viewed in the light most favorable to the government, showed that a common goal existed to transport large shipments of cocaine into the country and distribute them.  The nature of the underlying scheme was for Ruiz, and possibly F. Suarez and O. Suarez, to arrange for the cocaine to be smuggled into Texas from Mexico, to stash it in a hidden compartment built by Murillo in Sicard's house, and then to distribute it throughout the country using vehicles equipped with stashes constructed by Murillo and Avila.  The evidence indicates that Ruiz may have been the person responsible for importing the cocaine, but that for purposes of distribution, he relied on the resources of the Suarez brothers as well as on Murillo, Avila, Sicard, and the two DEA agents "recruited" by Murillo.  Murillo testified that F. Suarez explained to him that he was lending people and equipment to Ruiz in order to transport the drugs that Ruiz had smuggled into the country.  Although Murillo sometimes took direction from Ruiz, it is clear that he primarily took direction from F. Suarez, the person who originally recruited him into the drug trade.  Additionally, the evidence showed that Ruiz and the Suarezes worked together, as they attended mutual meetings and had numerous telephone conversations in which they arranged to transport the drugs.  F. Suarez instructed the undercover agents about the plans for transporting

4

the drugs, advised them on how to behave while carrying the drugs, and discussed how much they would be paid.

The evidence established that all four codefendants were aware of the common goal of drug distribution and that their participation in the conspiracy overlapped. Viewing the evidence in the light most favorable to the government, a reasonable trier of fact could have determined beyond a reasonable doubt that a single conspiracy existed among all the defendants. Because the government proved the single conspiracy alleged in the indictment, the district court did not err in denying the motion for judgment of acquittal.

II. **Whether the evidence at trial was sufficient to support Avila's conviction**

Avila argues on appeal that the evidence at trial was insufficient to support his conviction for essentially two reasons: (1) his physical disability rendered him unable to build the stash compartments; and (2) Murillo's testimony, without corroboration, was not sufficient to support his conviction. Avila's defense at trial consisted of the testimony of a general physician who had treated Avila since a 1996 accident when Avila fell from a ladder, injuring his neck, back, and elbow. The doctor testified that the injuries rendered Avila unable to lift more than five pounds with his left arm.

Murillo, on the other hand, testified that he and Avila had discussed the drug

operation and that Avila had explained to him the various ways of building stash compartments in automobiles. Murillo had additionally observed Avila build stash compartments into "many" cars, estimating the "many" to be approximately forty, in Miami, Houston, Philadelphia, Atlanta, and New York. He further testified that he and Avila together built a stash in a motor home. The government produced evidence to corroborate Murillo's testimony. One of the undercover DEA agents testified that Avila had assisted F. Suarez in obtaining the car the agent was to use to transport drugs. Avila was captured on tape stating that he was waiting to receive the title to that car before it could be used. An automobile that F. Suarez was seen driving to a meeting with co-conspirators, which contained a stash compartment, was found at Avila's house at the time of his arrest.

The jury saw Murillo testify and could evaluate his credibility in detailing Avila's role of building stashes in automobiles for the Suarez organization. Because Murillo's testimony was not incredible as a matter of law, the jury was entitled to consider it as evidence supporting a conviction. See U.S. v. Hewitt, 663 F.2d 1381, 1385 (11th Cir. 1981). The record contains ample evidence showing that Avila knew about, and participated in, the conspiracy, and the district court correctly denied the motion for judgment of acquittal.[1]

_____

[1]We also find no reversible error in the denial of Avila's motion for severance based on the disparity of evidence admissible against him as compared to his codefendants. A denial of a

6

III.     **Whether the evidence at trial was sufficient to support O. Suarez'**
         **conviction**

O. Suarez likewise argues that the district court erred in denying his motion for judgment of acquittal, claiming that the evidence was insufficient to support his conviction. He claims that, although the evidence showed he knew about the conspiracy and discussed the actions of others in the conspiracy, the record does not support his conviction because: (1) the evidence did not show that he took any actions that furthered the objectives of the conspiracy; and (2) much of the case against him was built on the testimony of Murillo, whose testimony was biased by the fact that he was a paid informant. Thus, he argues, the jury could not reasonably have concluded that he was guilty of conspiracy.

Viewing the evidence in the light most favorable to the government, we find no merit to O. Suarez' argument. The evidence shows that O. Suarez was present at numerous meetings where the business of the conspiracy was discussed. He was present when Murillo and Avila were constructing the trailer stash. He spoke with Murillo about reducing the price of transporting a shipment of cocaine, and his concern about getting a share of the profits. He planned to travel to Memphis to

---

motion for severance is reviewed for abuse of discretion. United States v. Taylor, 186 F.3d 1332, 1335 (11th Cir. 1999). In this case, Avila has not demonstrated that the jury, after receiving a cautionary instruction, was unable to sift through the evidence and make an individualized determination as to his guilt.

receive drugs, though it is unclear from the record if he ever actually traveled there. The jury, after listening to Murillo's testimony and tapes of phone conversations in which O. Suarez was recorded, and after being instructed that they must evaluate the evidence and determine the guilt of each individual defendant, could reasonably conclude from the evidence presented here that O. Suarez' was a participant in the conspiracy.

IV. **Whether the evidence presented at trial was sufficient to support Sicard's conviction for possession of a firearm during and in furtherance of a drug trafficking offense, under 18 U.S.C. § 924(c)(1)**

Sicard argues that his conviction for possession of a firearm must be reversed because there was insufficient evidence that this possession was "in furtherance of" the conspiracy set forth in the indictment. He asserts that the government presented no evidence that the firearms forwarded, promoted, advanced, or facilitated the conspiracy, but showed instead that Sicard's possession of the firearm was merely coincidental with the criminal conduct. The statute at issue, 18 U.S.C. § 924(c)(1)(A), applies when:

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm. . . .

8

The "in furtherance of any such crime, possesses a firearm" prong of the statute was added in November, 1998. See 18 U.S.C. § 924. Prior to that time, the government was required to prove that the defendant used or carried the firearm. The U.S. Supreme Court, construing the "use" prong of the old version of § 924(c), held that mere possession of a firearm during such a crime was not sufficient and required evidence of an active employment of the firearm by the defendant. Bailey v. United States, 516 U.S. 137, 143-44 (1995).

While the Supreme Court has not yet interpreted the new possession "in furtherance of" prong of 924(c)(1), this Court addressed the new provision in United States v. Timmons, 283 F.3d 1246 (2002), cert. denied, 2002 U.S. LEXIS 8140 (2002), where we adopted the reasoning of the Fifth Circuit, which was the first appellate court to address this issue. The Fifth Circuit held that the intent of Congress in adding the "in furtherance" language was to broaden the reach of the statute "in the wake of the Supreme Court's narrow construction" of the "use" prong in Bailey. Ceballos-Torres, 218 F.3d 409, 413 (5th Cir. 2000), cert. denied, 531 U.S. 1102 (2001). Reasoning that, even with the broader test, the mere presence of a firearm at a site of the drug activity was not enough, the Fifth Circuit listed several factors it found helpful in determining whether the defendant's possession furthered, advanced, or helped forward a drug trafficking offense,

including: the type of drug activity that was being conducted, the accessibility of the firearm, the type of weapon, whether the weapon was stolen, whether the possession of the firearm was legal, whether the gun was loaded, the gun's proximity to drugs or drug profits, and the time and circumstances under which the gun was found. Id. at 414-15.

In Timmons, this Court agreed with the Fifth Circuit's determination in Ceballos-Toress that Congress' intent in adding the possession "in furtherance of" prong was to broaden the reach of the statute. We examined the plain meaning of the word "furtherance" and cited extensively from the legislative history, to hold that "in furtherance of" meant that the firearm "helped, furthered, promoted, or advanced the drug trafficking." Timmons, 283 F.3d at 1252. We held that although "the presence of a gun within the defendant's dominion and control during a drug trafficking offense is not sufficient by itself to sustain a § 924(c) conviction," a conviction was supported by "a showing of some nexus between the firearm and the drug selling operation." Id. at 1252-53 (citing United States v. Finely, 245 F.3d 199, 202 (2d Cir. 2001), cert. denied, 534 U.S. 1144 (2002)). We adopted the Fifth Circuit's list of factors to aid in, among other things, "distinguish[ing] possession in furtherance of a crime from innocent possession of a wall-mounted antique or an unloaded hunting rifle locked in a

10

cupboard." Id. (citing United States v. Mackey, 265 F.3d 457, 462 (6th Cir. 2001), cert. denied, 534 U.S. 1097 (2002)).

Using the test this Court laid out in Timmons, we find sufficient evidence in this record to support Sicard's conviction under § 924 (c)(1). Murillo testified that Sicard's residence in Houston was the initial delivery point of the drugs from Mexico. From there, they were distributed throughout the United States. The second stash Murillo built for Sicard, under instructions that it be made as large as possible, was capable of holding 2,000 kilos of cocaine. The firearms found in Sicard's home consisted of a Mach 90 Sporter 7.62 millimeter semiautomatic rifle, the civilian version of an AK-47; a PWA, a version of the AR-15 semiautomatic rifle; a sawed-off shotgun; a Colt .380 semiautomatic pistol; a Glock .9 millimeter semiautomatic pistol; a Tech .9 millimeter Intertech pistol; and an AR-7 Explorer semiautomatic rifle. The firearms were distributed in several different places and easily accessible.[2] They were all loaded, and additional ammunition was found loose in a bag in the master-bedroom closet. Two of the firearms were illegally shortened. None of the weapons was of a type typically used for legal purposes,

---

[2]Sicard testified that, at the time the agents searched his house, two firearms were located in a corner of the bedroom closet, behind several hanging dresses and boxes; one was located in a sports bag in the same closet; one was in a drawer in a night stand; one was in his dresser underneath several shirts; one was in a bag in his car; and one was in a case located either in his bedroom closet or his dresser.

11

such as hunting.

Sicard testified in his own defense that he had legally purchased guns over several years as a collector and that he had asked Murillo, who introduced himself as a carpenter, to build a gun safe in his house. He claimed he left Murillo a key to his house, and Murillo built a compartment in the back of his closet under the stairs while Sicard was at work. After Murillo built the compartment, he returned, showed Sicard how to open it, and left some duffle bags containing radios, cell phones and pagers in the compartment, offering to pay Sicard to store the items. Sicard testified that several weeks later, Murillo told him he planned to come by to retrieve the items, and that Sicard removed his guns from the compartment at that time so that Murillo would not have access to them. Sicard testified that he did not have a relationship with any of the co-conspirators, even though he went to grade school with F. Suarez. He claimed that he never intentionally stored any cocaine in his house.

The jury rejected Sicard's story and accepted Murillo's version, and it was within its purview to do so. Thus, considering (1) the fact that Sicard's house was the major initial storage point of all the cocaine brought in from Mexico; (2) the type, location, and condition of the weapons at issue; and (3) the amount of drugs to be stored in his house, the jury could reasonably have inferred that the guns

were to be used to protect the conspirators' investment in their shipment. We find the evidence in this case sufficient to support a finding of possession of a firearm in furtherance of a drug-trafficking crime.[3]

## SENTENCING ISSUES

I.  **Whether the sentences violated <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000)**

All four defendants argue that their sentences were imposed in violation of <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000), as no drug quantity was alleged in the indictment or specifically found by the jury. Based on the record, we conclude that any <u>Apprendi</u> error was harmless. <u>See</u> <u>United States v. Cotton</u>, 122 S. Ct. 1781 (2002) (holding that given the undisputed evidence of drug quantity, no reasonable jury could have rationally concluded that the defendant was guilty of the substantive offense of possession with intent to distribute cocaine without also concluding that the defendant possessed more than five grams of cocaine.)

II. **Whether the district court erred in applying a four-level sentencing enhancement pursuant to U.S.S.G. § 3B1.1(a) for F. Suarez' role as a leader of the criminal activity**

---

[3]We also find no reversible error in Sicard's claim that venue was improper at to Count II because the crime took place entirely in Texas. In this case, Sicard was convicted of possession of a firearm in furtherance of a drug trafficking crime. Because Sicard concedes that the Southern District of Florida was an appropriate venue in which to try the underlying drug conspiracy, it was also proper for Sicard's § 924(c) count. <u>See</u> <u>United States v. Rodriguez-Moreno</u>, 526 U.S. 275, 280-82 (1999). Therefore, we find no reversible error in the district court's denial of Sicard's motion for a judgment of acquittal based on Fed.R.Crim.P. 29.

13

F. Suarez asserts that the evidence at trial showed that it was co-conspirator Umberto Ruiz who was the leader of the conspiracy, and thus, the district court erred in imposing a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a) for a leadership role in the offense. We find that this assertion is belied by the record. F. Suarez directed the movement of cocaine from one house to another and continually gave orders to Murillo, Ruiz, and the undercover agents. The recorded conversations show that Ruiz consulted with F. Suarez on all of his plans, and that F. Suarez gave the undercover agents detailed instructions for transporting the drugs. The record clearly reflects that F. Suarez spent a significant amount of time planning and organizing the building of hiding places, ordering the movement of the co-conspirators, and overseeing the distribution of the drugs from Sicard's house. The record clearly supports the conclusion that he had decision-making authority and exercised control. The evidence did not merely show that F. Suarez was knowledgeable about the drug business, but that he was a leader in this conspiracy. The district court did not clearly err in imposing the aggravating role adjustment.

III. **Whether the court erred in applying a two-level sentencing enhancement pursuant to U.S.S.G. § 2D1.1(b)(1) for possession of firearms by co-defendants to F. Suarez and O. Suarez**

Francisco and Omar Suarez both challenge the imposition of a two-level

enhancement for possession of a firearm by a coconspirator, arguing that the possession was not reasonably foreseeable to them and the court failed to support its conclusion with any case law or facts in the record. We do not find reversible error here. Sentencing Guideline 1B1.3(a)(1)(B) states that conspiracy members are to receive sentencing enhancements on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." This Court has held that the government must prove by a preponderance of the evidence that: (1) the possessor of the firearm was a co-conspirator; (2) the possession was in furtherance of the conspiracy; (3) the defendant was a member of the conspiracy at the time of possession; and (4) the co-conspirator possession was reasonably foreseeable by the defendant. See United States v. Gallo, 195 F.3d 1278, 1284 (11th Cir. 1999). The evidence in this case satisfies the requisite burden of proof.[4]

For the foregoing reasons, the convictions and sentences of the co-

---

[4]We also find no reversible error as to F. Suarez' argument, asserted for the first time in this appeal, that the district court should not have assessed criminal-history points for a conviction that occurred in 1983, more than 15 years prior to this offense, which commenced in July, 1999. Because the judgment and sentence for the earlier crime shows that F. Suarez was sentenced to 4 years' incarceration, the court assumed that F. Suarez was still incarcerated on that crime within 15 years of the current offense. As F. Suarez failed to raise this claim in the district court, we review this claim under the plain error standard to avoid manifest injustice. United States v. Harness, 180 F.3d 1232, 1234 (11th Cir. 1999). That standard has not been met. Any error would not result in manifest injustice because, even if he had been placed in criminal history category I, he would still have received a sentence of life imprisonment.

15

defendants are

**AFFIRMED**.