[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 5, 2006
THOMAS K. KAHN
CLERK

No. 05-13186
Non-Argument Calendar

_____

D. C. Docket No. 02-00021-CR-FTM-29-DNF

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAWN ANN CURRY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 5, 2006)**

Before TJOFLAT, ANDERSON and FAY, Circuit Judges.

PER CURIAM:

Dawn Ann Curry is appealing her convictions and her total 70-month sentence for conspiring to possess with intent to distribute a quantity of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846, and possession with intent to distribute a quantity of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C).  Curry argues on appeal that: (1) a material variance occurred between her indictment and the proof at trial relating to her conspiracy charge; (2) the district court erred in denying her motion for a judgment of acquittal on her conspiracy charge; (3) the court erred in admitting evidence of prior shipments addressed to Curry's residence; and (4) the court, in calculating Curry's offense level, clearly erred in finding her accountable for an amount of marijuana based on estimates relating to the prior shipments addressed to her residence.  For the reasons set forth more fully below, we affirm Curry's convictions and sentences.

A federal grand jury returned a two-count superseding indictment, charging Curry with the above referenced offenses, including that she conspired "with other persons" to possess with intent to distribute an unidentified quantity of marijuana. Prior to trial, Curry moved in limine to exclude the admission of, among other things, evidence showing prior shipments of crates to her residence.  Curry argued in these motions that the evidence either was not relevant, pursuant to

Fed.R.Evid. 404(b),[1] or its probative value was substantially outweighed by its prejudicial effect, pursuant to Fed.R.Evid. 403.[2]  After conducting a hearing, the district court ruled that the government could not admit this challenged evidence, subject to the court's reconsideration during trial.  The court also denied the government's pre-trial motion for reconsideration.  The government then filed an interlocutory appeal of the court's order granting Curry's motions in limine.[3]

In United States v. Curry, No. 03-12364 (11th Cir. Feb. 27, 2004) (unpub.), we affirmed in part and remanded in part, explaining that, although most of the challenged evidence should be excluded, evidence of the prior shipments that were

---

[1]  Rule 404(b) provides in relevant part that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . ..

See Fed.R.Evid. 404(b).

[2]  Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  See Fed.R.Evid. 403.

[3]  We had jurisdiction to consider the government's appeal under 18 U.S.C. § 3731, which permits the government to take interlocutory appeals from orders "suppressing or excluding evidence," up until the time the jury is sworn.  See 18 U.S.C. § 3731.  Although the court advised the parties that it was amenable to reconsidering its grant of Curry's motions in limine, the practical effect of the court's ruling was to exclude the evidence at issue.  See United States v. Drogoul, 1 F.3d 1546, 1551 n.13 (11th Cir. 1993) (holding that "district court orders are deemed to exclude evidence for the purposes of [§ 3731] whenever they have the practical effect of excluding evidence at trial").

3

addressed to Curry's residence, which we noted was from a "fictitious company," should not be excluded because it was relevant to show that Curry was part of a larger conspiracy. We further discussed that (1) we "[could not] imagine more appropriate evidence to tie Curry into the larger conspiracy," and (2) the probative value of this evidence was not substantially outweighed by any prejudice.

During a three-day jury trial in which Curry was the sole defendant, Dominic Dilenge, a truck driver for Old Dominion Freight Lines ("Old Dominion"), testified that, he delivered crates from "Classic Collectibles" to the Fort Myers, Florida area, through City Business Services ("CBS"), a packaging and shipping company in Los Angeles. Dilenge stated that he became suspicious of these crates because: (1) the crates were too well constructed to be carrying their listed freight, that is, either statues or plumbing supplies; (2) the delivery locations involved odd locations, including the parking lot of a baseball field and various homes; and (3) he often had to call someone on a cellular telephone to arrange deliveries. Although Dilenge initially could not recall whether he made shipments to Curry's residence, after the government refreshed his memory with documentary evidence, he stated that he made deliveries of crates on May 30, and July 3, 2001.

Steven Launikitis, a lieutenant with the Hillsborough County Sheriff's Office in Tampa, Florida, testified that, on February 28, 2002, after being

contacted about these suspicious shipments, he and other detectives went to Old Dominion's distribution facility with a drug-detection canine. After the dog alerted to a crate scheduled for delivery to Curry's residence, which weighed 150 pounds, the detectives obtained a search warrant for the crate and recovered from the bottom of it 115 pounds of marijuana, which was separated into four bales. Law enforcement officers, thereafter, put a tracking device inside the crate and conducted a controlled delivery of the crate to Curry's residence.

John Felts, a former special agent with the Drug Enforcement Agency ("DEA"), testified that, during this controlled delivery, he, while acting as an undercover delivery person, asked Curry's half-sister, Wilma Dixon, and Dixon's daughter, Christine Dixon, who were in the driveway area of the residence when he arrived, where they wanted him to place the crate. On Wilma Dixon's direction, Special Agent Felts and the delivery driver put the crate in the garage, and Dixon signed the bill of lading. Also during this delivery, Special Agent Felts heard Dixon state over the telephone: "It just arrived. It's in the corner of the garage."[4]

Michael Masiero, an officer with the Fort Myers Police Department who was assigned to the DEA task force, testified that, shortly after this controlled delivery, he observed Curry arrive at her residence in a minivan owned by Marlon Campbell

---

[4] The government introduced during trial telephone records reflecting that Dixon was talking to Curry.

5

("Mr. Campbell"), drive into the garage, and then drive out of the garage in the minivan with the crate inside of it. Moreover, Mark Strang, another DEA special agent, testified that, after law enforcement officers stopped this minivan, Curry told an officer that (1) she had cleaning supplies in the minivan, (2) the crate was in the minivan "when he gave it to her," and (3) she did not know of the crate's contents.[5] Special Agent Strang also stated that, after DEA agents transported Curry back to her residence and obtained a warrant to search it, they recovered paperwork relating to the delivery, as well as wood fragments on the floor of the garage that were consistent with the crate. Cary Oien, a trace-evidence examiner with the Federal Bureau of Investigations ("FBI"), also testified that the type of wood that was observed on Curry's clothing matched the wood found in the garage and the wood used to manufacture the crate.

Thomas Mosley, the manager of Old Dominion's Tampa facility, testified that, prior to February 22, 2002, Old Dominion had delivered similar crates from Classic Collectibles to Curry's address, including the following deliveries: (1) a 75-pound crate of "decorations or notations" to "Mitchell Roofing, Inc." at Curry's address on May 30, 2001; (2) a 110-pound crate containing a "statue" to "Mitchell

---

[5] On the other hand, Special Agent Strang testified that, while he was placing Curry into the patrol vehicle, he noticed that she had fragments of wood on her clothing, especially on the front of her pants.

Roofing, Inc." at Curry's address on July 3, 2001; (3) a 160-pound crate containing another "statue" to "Mitchell Roofing, Inc." at Curry's address on July 31, 2001; and (4) a 140-pound crate of "ornaments" to "Mitchell Roofing, Inc." at Curry's address on December 4, 2001. The government also showed that Curry's cellular telephone number was listed as the consignee's telephone number for the May and December deliveries, and that the telephone number for Marilyn Campbell ("Mrs. Campbell"), Marlon Campbell's wife, was listed for the July deliveries.[6]

Additional trial evidence included testimony by Special Agent Duquette that, during the hours after Curry's arrest, Mrs. Campbell repeatedly attempted to contact Curry on Curry's cellular telephone. Special Agent Duquette also stated that phone records revealed that Curry and Mrs. Campbell had been in contact with each other throughout the day prior to the delivery of the crate.

Furthermore, Larry Thomas testified for the government that he began dealing marijuana in Ohio in 1999, originally sending money through Western Union to a person named "Will" in California in exchange for Will sending him marijuana in cardboard boxes via the United Postal Service ("UPS"). Beginning in January 2001, after UPS discovered these deliveries, Will started sending the

_____

[6] Special Agent Steven Duquette of the DEA testified that, when law enforcement agents searched Curry's residence, they did not discover evidence of business activity. Moreover, the State of Florida had no record of any business registered in Southwest Florida that was doing business as "Mitchell Roofing, Inc." or "Jones Plumbing, Inc."

7

marijuana through Old Dominion in hand-fashioned wooden crates secured with screws and nails. In these crates, which were wooden, filled with styrofoam peanuts, and nailed shut, the marijuana was separated into bundles and covered with plastic, with something thrown on top to mask either the scent or the appearance of the marijuana. Because Old Dominion only would make deliveries to businesses, Thomas arranged for acquaintances to accept deliveries at their business addresses, explaining that the crates contained statues. From March 2001 through March 2002, Thomas received from Will hundreds of pounds of marijuana, with deliveries sent in 11 crates. On cross-examination, Thomas agreed that the crates were not unusual.[7] Thomas also conceded that he did not know Curry and that his supplier had not mentioned her name or the fact that he made shipments to Florida.

At the conclusion of the government's case, Curry moved to strike all of the evidence relating to the Ohio transactions, arguing that the government had failed to establish a connection between those transactions and Curry's charges. The district court denied this motion, explaining that, although the connection was not "overwhelming," it was consistent with the government's proffer, the evidence was

---

[7] Peter Adeli, the owner of CBS, testified that CBS, which was a legitimate business, was merely the shipper, and that "Classic Collectibles" was listed as the vendor for each of the prior deliveries at issue in this case.

sufficient for admissibility, and admissibility was in accordance with this Court's decision on the government's interlocutory appeal.

Additionally, Curry moved for judgments of acquittal at the close of the government's case and at the close of all of the evidence, arguing that the government had failed to prove a connection between the February 2002 delivery and the Ohio transactions, or between herself and the Campbells. The district court also denied these motions, again explaining that, although the evidence of the conspiracy was not "overwhelming," a reasonable jury could find Curry guilty of the offense.

During the charge conference, Curry moved the court to instruct the jury on multiple conspiracies. After the government raised no objections to this instruction, the court instructed the jury as follows:

> [P]roof of several separate conspiracies is not proof of a single overall conspiracy charged in the superseding indictment unless one of the several conspiracies which is proved is the single conspiracy which the superseding indictment charges. What you must do is determine whether the single conspiracy charged in the superseding indictment existed between two or more conspirators.
>
> If you find that no such conspiracy existed, then you must acquit the defendant on that charge. However, if you decide that such a conspiracy did exist, you must then determine who the members were. And, if you should find that a particular defendant was a member of some other conspiracy, not the one charged in the superseding indictment, then you must acquit the defendant. In other words, to find a defendant guilty, you must find, unanimously, that such

9

defendant was a member of the conspiracy charged in the superseding indictment, and not a member of some other, separate conspiracy.

The jury convicted Curry as charged in her superseding indictment.

Curry's presentence investigation report ("PSI") recommended that she be held accountable for a total of 230.3 kilograms of marijuana, based on the 54.4 kilograms of marijuana that was shipped to her residence on February 28, 2002, and an estimated 175.9 kilograms that was shipped to her residence during the four prior shipments in 2001. With a resulting offense level of 26, pursuant to U.S.S.G. § 2D1.1(c)(7), and a recommended criminal history category of III, Curry had an advisory guideline range of 78 to 97 months' imprisonment.

Curry objected to this drug amount, arguing that the government had not shown during her trial either that she possessed other crates of marijuana, or the contents of these crates. Thus, Curry asserted that she only should be held accountable for the marijuana that was shipped to her residence in February 2002. The probation officer responded that (1) shipping records showed that at least five crates were shipped to Curry's residence, (2) all of these crates came from the same sender through the same shipper, (3) the 175.90 kilograms of marijuana attributed to Curry based on these prior shipments properly was estimated using the weights of the February 2002 delivery, that is, 54.4 kilograms of marijuana comprised 80-percent of the weight of the crate.

10

At sentencing, Curry renewed her objection to the recommended drug amount. Curry again argued that this amount was improperly speculative because (1) the procedure used by the probation officer to calculate an estimate of the amount of marijuana involved in the prior deliveries was improper, (2) the government failed to show that these prior deliveries even contained marijuana, and (3) the government failed to show who accepted these deliveries. The government responded that this drug calculation, which included relevant conduct, was correct because (1) the crates used in the previous deliveries were the same types of crate that had been used to transport the marijuana in February 2002, and (2) regardless of whether Curry personally had accepted delivery of all of these crates, someone had accepted delivery of them during the course of the conspiracy of which Curry had been convicted.

The district court overruled Curry's objection to drug amount, finding it "more likely than not that those crates contained marijuana." The court also discussed as follows:

> The issue with regard to how much marijuana, the Court doesn't have any precise figures, and there's no way of knowing that. The Court is allowed to make a reasonable estimate with regard to the guideline calculation. It's only material if there's more than 45.6 grams–or kilograms, rather, of marijuana, that gets it over the [100] kilogram threshold, because you had 54.4 kilograms of marijuana that was actually seized in the case.

11

> The methodology used by probation, in my view, is reasonable. Probation comes up with 175 kilograms, which is far more than you need to satisfy the guideline threshold that's applicable in this case.
>
> So the Court finds that there was at least 50 additional kilograms of marijuana in those other crates, and that that marijuana is attributable to the defendant. And the Court will overrule the objection.

After granting Curry's motion for a downward departure to criminal history category II, pursuant to U.S.S.G. § 4A1.3, thereby reducing her advisory guideline range to 70 to 87 months' imprisonment, the court sentenced Curry to 70 months' imprisonment, 3 years' supervised release, and $200 in special assessment fees.

**Issue 1:** <u>**Whether a material and prejudicial variance occurred**</u>

Curry argues on appeal that no reasonable jury could have determined beyond a reasonable doubt that a single conspiracy existed because the government failed to introduce evidence connecting the crate Curry received in February 2002, to the drug-distributing operation Thomas was conducting in Ohio, other than the fact that CBS, a legitimate packaging and shipping company, was used in both cases. Curry alternatively contends that, even if the government established that she and Thomas received drugs from the same supplier, this fact, alone, did not establish a single conspiracy. Additionally, Curry argues that the government failed to establish that a conspiracy existed between herself and the Campbells by

12

showing only that (1) the minivan used was registered to Mr. Campbell, and (2) Mrs. Campbell attempted to contact Curry after Curry's arrest.

Reversal is warranted if (1) a single conspiracy is charged in the indictment but multiple conspiracies are proven at trial, and (2) the variance was material and substantially prejudiced the defendant. United States v. Suarez, 313 F.3d 1287, 1289 (11th Cir. 2002) (citation omitted). "The arguable existence of multiple conspiracies, however, does not constitute a material variance from the indictment if, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found that a single conspiracy existed beyond a reasonable doubt." Id. To determine whether a jury could have found that a single conspiracy existed, we review "(1) whether a common goal existed, (2) the nature of the underlying scheme, and (3) whether the participants of the alleged multiple schemes overlapped." Id.

We also have explained that, "to prove a single, unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies, the government must show an interdependence among the alleged co-conspirators." United States v. Chandler, 388 F.3d 796, 811 (11th Cir. 2004). Separate transactions, however, are not necessarily separate conspiracies, "so long as the conspirators act in concert to further a common goal." Id. "If a defendant's actions facilitated the endeavors of

13

other co[-]conspirators or facilitated the venture as a whole, then a single conspiracy is shown." Id. (internal quotation and marks omitted). Indeed, although we concluded in Chandler that no interdependence of the conspirators existed, we noted that, unlike the charged conspiracy to commit mail fraud in connection with a scheme to defraud promoters of promotional games by stealing game stamps and redeeming them for money, "[i]n a drug conspiracy, in which the object of the conspiracy is clearly illegal and there are various clandestine functions to perform, the conspirators can be charged with knowledge that others are performing these different functions." Id. at 811-12 n.21.

Viewing the evidence in the light most favorable to the government, although the government arguably relied on alternative conspiracy arguments relating to evidence of drug activities conducted by Thomas and the Campbells, the evidence reflected that Curry and Thomas both were engaged in the distribution of marijuana. See United States v. Calderon, 127 F.3d 1314, 1327 (11th Cir. 1997) (emphasizing that "common" for purposes of this test means "similar" or "substantially the same," rather than "shared" or "coordinate[d]"); United States v. Adams, 1 F.3d 1566, 1584 (11th Cir. 1993) (holding that the "common goal" inquiry was satisfied by the common crime of co-conspirators' importation of marijuana). Curry and Thomas also used essentially the same means of

14

transporting this marijuana, that is, placing the marijuana in the bottom of hand-fashioned wooden crates. See Calderon, 127 F.3d at 1327 (explaining that the drug smuggling occurred aboard the same vessel, in the same hidden compartments, and in essentially the same manner and over a relatively short period of time).

Additionally, although Thomas conceded that he did not know Curry, the government established that both Thomas and Curry received deliveries from "Classic Collectibles" through CBS and via Old Dominion. See United States v. Anderson, 326 F.3d 1319, 1327-28 (11th Cir. 2003) (explaining that we "permit[] the finding of a single conspiracy where a 'key man' directs the activities, coordinating the individual efforts of various combinations of people"); United States v. Stitzer, 785 F.2d 1506, 1518 (11th Cir. 1986) (holding that the overlap of a common distributor was sufficient to support the finding that five separate conspiracies were part of one conspiracy). Thus, viewing the evidence in the light most favorable to the government, a rational jury could have found beyond a reasonable doubt that a single conspiracy between Thomas and Curry existed. See Suarez, 313 F.3d at 1289.

Nevertheless, we need not determine whether a variance occurred because Curry has failed to show that she was prejudiced. "[V]ariance from an indictment is not always prejudicial, nor is prejudice assumed." United States v. Alred, 144

15

F.3d 1405, 1415 (11th Cir. 1998) (quotation omitted).  To demonstrate substantial prejudice, the defendant must show: "(1) that the proof at trial differed so greatly from the charges that [she] was unfairly surprised and was unable to prepare an adequate defense; or (2) that there are so many defendants and separate conspiracies before the jury that there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another."  Id. (quotation omitted) (emphasis in original).

In Chandler, we determined that the defendants were prejudiced by the material variance when the government alleged conduct that was not a crime and spent substantial time during the trial eliciting testimony regarding that "crime," before conceding at the end of trial that the law was to the contrary.  See Chandler, 388 F.3d at 812.  We concluded that the jury's decision to convict the defendants in the "utter absence of any proof," and after the court gave a last-minute instruction completely reversing the court's earlier position on the charged conspiracy, demonstrated that the jury was prejudiced by evidence of another conspiracy.  See id. at 812-13.

On the other hand, in United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998), we concluded that the defendants were fairly apprised of their charged activity and that, although they each argued from the government's omission of

16

joint evidence that they knew nothing of the drug operation, the evidence of their own purchases and distributions was left unimpeached. See id. at 1252 (affirming despite that evidence in narcotics prosecution that defendants purchased large amounts of cocaine from the same supplier, cooked it, and distributed it as cocaine base was insufficient to establish the existence of a single conspiracy). We also concluded that, to the extent the defendants were arguing that they were prejudiced by the spillover of evidence as the result of being tried together, this argument was belied, at least in part, by the court's instruction to the jury that it had to acquit unless one of the several conspiracies that was proved was the single charged conspiracy. See id. ("[w]hen the proof at trial reveals the existence of more than one conspiracy, the adequacy of the trial judge's instructions are of critical importance in evaluating the likelihood that confusion or prejudice resulted from transference of guilt from one conspiracy to another") (quotation omitted).

Here, Curry was the only defendant at trial, and her superseding indictment generally charged her with conspiring "with other persons" to possess with intent to distribute an unidentified quantity of marijuana. Curry also has failed to explain how "the proof at trial differed so greatly from the charges that [she] was unfairly surprised and was unable to prepare an adequate defense." See Alred, 144 F.3d at 1415. Indeed, similar to the facts in Glinton, the evidence of her role in accepting

the February 2002 delivery was left unimpeached. Additionally, the court instructed the jury that it had to find "unanimously, that [Curry] was a member of the conspiracy charged in the superseding indictment, and not a member of some other, separate conspiracy." See United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005) (explaining that a jury is presumed to follow instructions given to it by the court).

Thus, even if a material variance between the conspiracy charged in Curry's indictment and the evidence at trial resulted, Curry has not demonstrated that she was substantially prejudiced. We, therefore, conclude that any variances were immaterial and affirm Curry's convictions.

**Issue 2:**       **Motion for a judgment of acquittal**

Curry also summarily argues that, for the same reasons why a material variance between the indictment and the proof at trial resulted, no reasonable jury could have found her guilty of the charged conspiracy. Curry contends that we must reverse her conviction "unless reasonable minds could conclude that the evidence is inconsistent with every hypothesis of innocence." Additionally, Curry asserts for the first time in reply that an unsupported allegation that she "was involved in a conspiracy with some unknown party" was insufficient.[8]

---

[8] To the extent Curry appears to be challenging the sufficiency of her indictment for the first time in reply, we conclude that she abandoned it by not arguing it in her initial brief. See

We review de novo the denial of a motion for a judgment of acquittal. United States v. Hernandez, 433 F.3d 1328, 1332 (11th Cir. 2005), cert. denied, 126 S.Ct. 1635 (2006). "When the motion raises a challenge to the sufficiency of the evidence, we review the sufficiency of the evidence de novo, drawing all reasonable inferences in the government's favor." Id. (quotation omitted). "The evidence is sufficient where a reasonable trier of fact could conclude that the evidence established guilt beyond a reasonable doubt." United States v. Marte, 356 F.3d 1336, 1344-45 (11th Cir. 2004). "Indeed, a verdict of guilty cannot be disturbed if there is substantial evidence to support it, 'unless no trier of fact could have found guilt beyond a reasonable doubt.'" United States v. Pineiro, 389 F.3d 1359, 1367 (11th Cir. 2005) (internal quotation omitted).

"To sustain a conviction for conspiracy to possess [marijuana] with intent to distribute, the government must prove beyond a reasonable doubt that (1) an illegal agreement existed; (2) the defendant knew of it; and (3) the defendant, with knowledge, voluntarily joined it." Hernandez, 433 F.3d at 1333 (quotation omitted). In determining whether an illegal agreement existed, "[i]t is well settled that the existence of an agreement in a conspiracy case is rarely proven by direct

United States v. Smith, 416 F.3d 1350, 1352 n.1 (11th Cir.) (explaining that the prudential rule of declining to consider issues not timely raised in a party's initial brief is "well-established" in this Circuit), cert. denied, 126 S.Ct. 784 (2005).

19

evidence that the conspirators formally entered or reached an agreement . . .. The more common method of proving an agreement is through circumstantial evidence." Pineiro, 389 F.3d at 1369 (internal quotation and marks omitted). Moreover, the government need only prove that the defendant "knew the general nature and scope of the conspiracy." Id. at 1368.

As discussed in Issue 1, although the government did not present direct evidence of a conspiratorial agreement, circumstantial evidence of this agreement included that Curry and Thomas both were engaged in the distribution of marijuana; Curry and Thomas used essentially the same means of transporting this marijuana, that is, in the bottom of hand-fashioned wooden crates; and both Thomas and Curry received deliveries from "Classic Collectible" through CBS, and via Old Dominion. Additionally, although Curry told law-enforcement officers who stopped her in February 2002, that she did not know of the contents of the crate inside the minivan and that the crate was in the minivan before she started driving it, this statement was belied by evidence that wood fragments recovered from the floor of the garage, where the crate was delivered, matched wood (1) observed on Curry's clothing, and (2) used to manufacture the crate. Thus, even though, as the district court noted, evidence of a conspiracy was not

"overwhelming," Curry has failed to show that "no trier of fact could have found guilt beyond a reasonable doubt." See id. at 1367.

**Issue 3:     Evidence of prior shipments addressed to Curry's residence**

Curry argues that the district court abused its discretion in admitting evidence of prior shipments that listed her residence as the delivery address. Curry concedes that this admission followed our decision vacating the district court's earlier order granting her motion to exclude this evidence, but she contends that our decision was in error due to the government's creating the misleading inference that CBS was not a legitimate business. Curry also contends that the prejudicial effect of this evidence outweighed any probative value because the government failed to show either the contents of these prior shipments, or that the shipments were actually delivered to her residence.

The doctrine of the law of the case "bars relitigation of issues that were decided, either explicitly or by necessary implication, in an earlier appeal of the same case." United States v. Jordan, 429 F.3d 1032, 1035 (11th Cir. 2005). Thus, under this doctrine, "an issue decided at one stage of the case is binding at later stages of the same case." United States v. Escobar-Urrego, 110 F.3d 1556, 1560 (11th Cir. 1997). This doctrine has "developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing

21

lawsuit." Id. (quotation omitted). It, however, has exceptions, including when "the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." Id. at 1561 (quotation omitted).

In vacating the district court's order granting Curry's motion to exclude evidence of four prior shipments that listed Curry's residence as the delivery address, we explained that this evidence should not be excluded because (1) it was relevant to show that Curry was part of a larger conspiracy, and (2) the probative value of this evidence was not substantially outweighed by any prejudice. As discussed above, Curry is contending that the district court was not barred by this prior decision from excluding this evidence because the evidence at trial revealed that, contrary to the government's arguments relating to the original motion to exclude, CBS was merely the shipper and, thus, not criminally connected with "Classic Collectibles." Despite this evidence, however, the government still established that "Classic Collectibles," through CBS, previously shipped four other crates to Curry's residence via Old Dominion, and that at least two of the crates actually were delivered to her residence. Thus, the evidence at trial was not "substantially different," and our earlier decision that this evidence was admissible

22

was controlling.  See id.  The district court, therefore, did not err in admitting evidence of prior crate shipments.

**Issue 4:**       **Calculation of Curry's offense level**

Curry last challenges her 70-month sentence, arguing that the district court, in calculating her base offense level, clearly erred in determining drug amount. Curry contends that the court should not have included in this calculation evidence of the prior shipments that were purportedly made to her residence because: (1) the contents of these prior shipments was purely speculative; and (2) the government presented no evidence showing that Curry received any of these prior shipments. Curry also asserts that this calculation was arbitrary and speculative because the actual amount of marijuana was based solely on the drug and packing weights of the crate in the instant case.  Additionally, Curry argues that, although her guideline range was only advisory under United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), she was prejudiced by this error because the court clearly intended to sentence her at the bottom of her guideline range.

In Booker, the Supreme Court concluded that a defendant's guideline range is now advisory and no longer dictates his final sentence, but, instead, is an important sentencing factor that the sentencing court is to consider, along with the factors contained in 18 U.S.C. § 3553(a).  Booker, 543 U.S. at 259-60, 125 S.Ct. at

764-65. Post-Booker, "the district court remains obliged to 'consult' and 'take into account' the [g]uidelines in sentencing." United States v. Crawford, 407 F.3d 1174, 1178 (11th Cir. 2005). "This consultation requirement, at a minimum, obliges the district court to calculate correctly the sentencing range prescribed by the [g]uidelines[.]" Id. (emphasis in original). We also continue to review a district court's factual determinations, such as the drug amount at issue on appeal, for clear error. See id. at 1178-79 (11th Cir. 2005) (explaining that Booker did not alter either our review of the application of the guidelines, or our standards of review). We cannot find clear error unless it is "left with a definite and firm conviction that a mistake has been committed." Id. at 1177 (quotation omitted).

Section 2D1.1 of the federal guidelines provides that the base offense level for a possession or a conspiracy drug offense ordinarily is calculated by determining the quantity of drugs attributable to a defendant. See generally U.S.S.G. § 2D1.1(a). To sentence Curry based on an offense level of 26, the district court had to find her responsible for at least 100 kilograms of marijuana. See U.S.S.G. § 2D1.1(c)(7). The federal guidelines also provide that court must attribute to a defendant "all the drugs foreseeably distributed pursuant to a common scheme of which the defendant's offense of conviction is a part." United States v. Agis-Meza, 99 F.3d 1052, 1054 (11th Cir. 1996).

24

"When the defendant objects to a factual finding that is used in calculating his guideline sentence, such as drug amount, the government bears the burden of establishing the disputed fact by a preponderance of the evidence." United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir), cert. denied, 125 S.Ct. 2935 (2005). "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." Id. (quotation and internal quotation omitted). "[I]n estimating the quantity of drugs attributable to a defendant, a court may base its computation on evidence showing the average frequency and amount of a defendant's drug sales over a given period of time." Id. Although sentencing cannot be based on calculations of drug quantities that are merely speculative, sentencing "may be based on fair, accurate, and conservative estimates of the quantity of drugs attributable to a defendant." United States v. Zapata, 139 F.3d 1355, 1359 (11th Cir. 1998).

The crate of marijuana that was sent to Curry and was seized by law-enforcement agents on February 28, 2002, contained 115 pounds of marijuana, that is, 54 kilograms of marijuana. Additionally, the government offered testimony at trial that Old Dominion previously had delivered similar crates from Classic Collectibles to Curry's address, including: (1) a 75-pound crate of "decorations or notations" to "Mitchell Roofing, Inc." at Curry's address on May 30, 2001;

25

(2) a 110-pound crate containing a "statute" to "Mitchell Roofing, Inc." at Curry's address on July 3, 2001; (3) a 160-pound crate containing another "statue" to "Mitchell Roofing, Inc." at Curry's address on July 31, 2001; and (4) a 140-pound crate of "ornaments" to "Mitchell Roofing, Inc." at Curry's address on December 4, 2001. Using the weights of the February 2002 delivery, that is, 54.4 kilograms of marijuana comprised 80-percent of the weight of the crate, the court, over Curry's objection, concluded that these prior four crate deliveries involved an additional 175.90 kilograms of marijuana. Thus, the court concluded that the government established "far more" than necessary to justify an offense level of 26 under § 2D1.1(c)(7).

Curry is contending that the court clearly erred in finding that the shipments made prior to February 2002, actually were delivered to her address, and she has cited to Dilenge's initial testimony that he could not remember whether he had made any shipments to Curry's residence before February 2002. However, the fact that all of these shipments listed Curry's address and at least some of them also included her cell-phone number as the consignee's number, as well as listing Mrs. Campbell's home-phone number as a consignee number, demonstrates that these shipments were "foreseeably distributed pursuant to a common scheme of which

26

[Curry's] offense of conviction [was] a part" and, thus, countable as relevant conduct. See Agiz-Meza, 99 F.3d at 1054.

Additionally, to the extent Curry is challenging the court's finding that these prior shipments contained 175 kilograms of marijuana, and she is relying on the fact that these shipments were not seized, these shipments, like the shipment seized in February 2002, and the shipments sent to Thomas, (1) were sent in crates from "Classic Collectibles" through CBS and via Old Dominion; and (2) had contents identified as "decoration," "ornaments," or "statues." Thomas also explained that "statue" was the cover description for marijuana he received. Moreover, in the absence of direct evidence of the amount of marijuana contained in these crates, the court did not clearly err in estimating these amounts based on the amount and percentage of marijuana recovered from the February 2002 shipment, and its conservative estimate of 175 kilograms was well over the 46-kilogram amount necessary to justify an offense level of 26. See Rodriguez, 398 F.3d at 1296; see also Zapata, 139 F.3d at 1359. Thus, the district court did not clearly err in determining that Curry should be held accountable for at least 100 kilograms of marijuana and in sentencing her based on an offense level of 26.

Accordingly, we conclude that, if any material variance occurred between Curry's conspiracy charge in her indictment and the proof at trial, she was not

27

prejudiced by it. Because Curry failed to show that "no trier of fact could have found guilt beyond a reasonable doubt," the district court did not err in denying Curry's motion for a judgment of acquittal as to her conspiracy charge. Under the law-of-the-case doctrine, the district court also did not err in denying Curry's motion to exclude evidence of other shipments addressed to her residence after we determined that this evidence was admissible. Finally, the district court did not clearly err in using reasonable and conservative estimates in determining the amount of drugs attributable to Curry. We, therefore, affirm Curry's convictions and her total 70-month sentence.

**AFFIRMED.**