In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 14-2617

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JUAN AMAYA,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-cr-710 — **Rebecca R. Pallmeyer**, *Judge.*

---

ARGUED SEPTEMBER 9, 2015 — DECIDED JUNE 3, 2016

---

Before EASTERBROOK, KANNE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* For a time, Juan Amaya was a ranking officer in the Latin Kings, a vicious and well-organized street gang whose structure and operations we have previously described in detail. *See generally United States v. Garcia*, 754 F.3d 460, 465–68 (7th Cir. 2014). A jury convicted

him of drug-related crimes (distributing cocaine, possessing cocaine with the intent to distribute it, and carrying a gun in furtherance of his cocaine distribution) and organized-gang-related crimes (conspiring to conduct racketeering activity and aiding and abetting a violent crime in aid of racketeering). On the gun count and the two racketeering counts, Amaya challenges the sufficiency of the government's evidence, but we find that the evidence sufficiently supported the jury's verdict.

Amaya also challenges the admission of an out-of-court statement made by an undercover law-enforcement agent, but the statement was not hearsay because it was not offered for its truth, and its admission was not unduly prejudicial. Finally, Amaya argues that the admission of an out-of-court statement made by a confidential informant violated Amaya's constitutional right to confront the witnesses against him. But the statement was not the type of "testimonial" statement covered by the Sixth Amendment's Confrontation Clause. For these reasons, we affirm Amaya's convictions.

## I. BACKGROUND

This case arose out of an investigation into the Latin Kings street gang, an organization whose activities involve murder, assault, extortion, and drug dealing.[1] The government contended that Amaya was a long-time member of the gang who rose through the ranks to become a regional leader. There was

---

[1] Given the procedural posture, we view the evidence in the light most favorable to the government. *Musacchio v. United States*, 136 S. Ct. 709, 711–12 (2016). So we describe the facts assuming the jury believed the government's evidence. That said, Amaya admits he was a Latin King and has not disputed significant details about the gang's structure or operation.

evidence concerning the gang in general (and specifically as it operated in Amaya's territory), and evidence concerning Amaya's individual conduct.

## A. Gang Structure

The Latin Kings operated in various parts of Illinois, including Chicago. The gang was highly organized and hierarchical, with its own constitution, manifesto, and code of conduct, as well as its own colors, handshake, salute, emblems, signs, flag, and territories. Territories were divided into "regions," which were further divided into "sections" (sometimes called "chapters"). The highest-ranking member of a section is the "Inca," and the highest-ranking member of a region is the "Regional Inca."

The "26th Street Region" operated in the southwest Chicago neighborhood known as Little Village. The region had twenty-four sections, including the "Sawyer and 22nd Section," which Amaya had joined by sometime in 2005. He rose to Regional Inca by early February 2008, and kept that position until May or June 2008. In that position, Amaya was in charge of about one thousand gang members. As Regional Inca, Amaya was outranked by only the "Supreme Regional Inca" (who oversaw multiple regions) and the head of the entire organization, the "Corona."

Members were required to pay "dues," which allowed the gang to buy guns, ammunition, cell phones, and police scanners, among other things. As Regional Inca, Amaya ensured that dues were paid. Dues were collected at the chapter level and some of the money was passed up to Amaya at the regional level. As Regional Inca, Amaya announced a plan to

redistribute dues money so that each chapter had adequate resources, even those with small memberships.

**B. Gang Rules and Practices**

As Regional Inca, Amaya was responsible for enforcing applicable rules, which came from the gang's manifesto, its constitution, and the 26th Street Region's local rules. A primary rule was that members were required to protect the gang's territory from its rivals, often through violence. For example, from Thursday night through Sunday morning, the 26th Street Region was on "mandatory bust out." That meant that members patrolled their territory, armed with guns, and were required to shoot to kill any trespassing member of a rival gang. Members were required to carry guns when they loitered in their own territory and also when they traveled to rival territory. While Amaya was Regional Inca, gang policy dictated that if a Latin King was shot, the gang was required to conduct multiple retaliatory drive-by shootings. Around April 2008, while Amaya was Regional Inca, he bragged that 26 rival gang members had been shot during his tenure.

The rules also required violence against fellow Latin Kings. New recruits were initiated into membership through beatings. The rules provided for mandatory beatings for any member who broke the rules (these beatings were called "violations"). Although unwritten, there was a rule requiring that present or former gang members be killed on sight if they were known to have cooperated with law enforcement.

Given the mandatory shooting requirements, discussed above, it is not surprising that there were also rules governing what to do with guns that had been used in shootings. In the

26th Street Region, if a gun was used in a shooting that re-
sulted in a death, the rules required the gun be disposed of.
The local chapter would try to sell the gun to a suburban chap-
ter, would throw it in the river, or would "chop it up" (physi-
cally destroy it piece by piece).

### C. Amaya's Individual Conduct

#### 1. Punishment of Fellow Latin Kings

The rules prohibited stealing within gang territory. But
around April 2008, two members stole from a home in the
26th Street Region. (To make matters worse, it was the home
of the Corona's girlfriend.) Because the home was within
Amaya's region, he was charged with enforcing the punish-
ment. The Corona initially ordered severe beatings in which
any weapon could be used over an unlimited period of time,
but Amaya believed that was too harsh, so he recommended
that the thieves' hands be smashed instead—a recommenda-
tion the Corona accepted.

In a meeting that was secretly audio and video recorded,
Amaya instructed that the thieves' hands be smashed with a
hammer or a brick, rather than the baseball bat that another
member had initially selected. The first thief submitted to the
vicious beating without resistance. Amaya picked the specific
gang member to carry out the attack and waited outside the
room as it happened; he received a report when it was com-
pleted. Later that same day, the second thief was beaten, again
at Amaya's direction, and again with Amaya receiving a re-
port upon completion.

### 2. Extortion of Other Criminals

While Amaya was a Latin King, including while he was a Regional Inca, the gang extorted "miqueros"—people illegally selling fake identification cards. The miqueros paid the gang a monthly fee, which bought them protection and the privilege of operating a monopoly within gang territory. Refusal to pay the fee led to beatings.

### 3. Drug Trafficking

The Latin Kings' constitution expressly forbade selling certain drugs, including heroin, LSD, and crack cocaine. Applying (perhaps unknowingly) the canon *expressio unius est exclusio alterius*, the gang interprets the constitution to permit selling powder cocaine, so members did so (regulated by the gang). Gang members who could not repay their debts were prohibited from accepting drugs from other members on credit. Disputes among members arising out of drug sales were resolved by gang leadership. The leadership of the 26th Street Region allowed members who were actively involved in drug dealing to be excused from the "mandatory bust outs" as long as they paid extra dues by sharing some of their drug profits.

Amaya was removed as Regional Inca in May or June of 2008. (He was suspected of conspiring to kill the Corona, but those suspicions were eventually ruled unfounded.) But he remained a gang member in good standing and on September 28 and November 3, 2010, he sold cocaine to Sergeant Sean Koren, an undercover law-enforcement agent posing as a Latin King from out of town. The agent was accompanied by two confidential informants who were Latin Kings.

For both deals, Amaya arranged to meet at an alley in rival gang territory. The deals took place in Sergeant Koren's car and were audio and video recorded (though the September video is too dark to be useful). Both deals began with a handshake and greeting ("King Love") that identified the parties as Latin Kings. During the September deal, Amaya said, "they all right here" and "I be waiting for their asses," which the government contended referred to rival gang members in the vicinity. Sergeant Koren testified that as Amaya made these statements, he brandished a gun and pointed it down the alley. Amaya then sold Koren about half an ounce of cocaine and got out of the car.

At the November meeting, Amaya sold Koren about an ounce of cocaine. One of the informants commented that there were members of a rival gang in the alley, to which Amaya responded, "They live right here, dog. Remember? I pulled out that other pistol. That was you guys, right?" Amaya said that the rival gang members "use this gang-way a lot." Sergeant Koren asked Amaya if he had more guns, to which Amaya responded that he had gotten rid of the one he had displayed back in September. Amaya said that some gang members had used the gun, so he "told them dump it. Chop it up." Amaya then asked Koren and the informants if they knew anyone that could get him handguns.

### D. Amaya's Prosecution

Under a superseding indictment, Amaya was prosecuted for drug crimes (distributing cocaine and possessing cocaine with the intent to distribute it), a gun crime (possessing a gun in furtherance of cocaine distribution), and racketeering crimes (conspiring to participate in racketeering and aiding

and abetting a violent assault to maintain his position in a racketeering enterprise).

Amaya pleaded not guilty to all charges. At trial, the government introduced audio and video recordings as well as testimony from Sergeant Koren, another law-enforcement agent who witnessed the drug deals, a special investigator, and two cooperating Latin Kings. The jury found Amaya guilty on all counts and the court sentenced him to 420 months in prison.

## II. ANALYSIS

Amaya challenges the sufficiency of the evidence as to the gun-possession conviction and the two racketeering-related convictions. To resolve those challenges, we view the evidence "in the light most favorable to the government" and we will "overturn the verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Morales*, 655 F.3d 608, 634 (7th Cir. 2011) (citation and quotation marks omitted).

As to the gun charge, Amaya also raises two evidentiary issues. First, he argues that admission of certain hearsay evidence was unduly prejudicial—an issue we review for an abuse of discretion. *United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011); *United States v. Bonner*, 302 F.3d 776, 780 (7th Cir. 2002). Second, he argues that the admission of a confidential informant's out-of-court statement violated the Confrontation Clause of the Sixth Amendment—an issue we review de novo. *United States v. Adams*, 628 F.3d 407, 416 (7th Cir. 2010). We will not overturn a conviction due to a hearsay or

Confrontation Clause error if the error was harmless. *United States v. Nicksion*, 628 F.3d 368, 375 (7th Cir. 2010).

### A. Gun Possession

Amaya argues that the evidence was insufficient to show: (1) he possessed a gun; or (2) if he possessed a gun, he did so "in furtherance of" a drug crime. He also argues that his conviction was based on hearsay statements, admitting those statements was prejudicial, and admitting one of those statements violated his constitutional right to confront the witnesses against him.

### 1. Sufficient Evidence of Amaya's Gun Possession

Sergeant Koren testified that Amaya carried a gun to the September drug deal. As Amaya concedes, the jury was entitled to believe this testimony. But Amaya says that no reasonable jury could have concluded beyond a reasonable doubt that the gun was *real*, and Amaya can't be convicted for carrying a fake gun. Amaya is right that 18 U.S.C. § 924(c) requires a real gun. 18 U.S.C. § 921(a)(3) ("firearm" in § 924(c) means a weapon "which will or is designed to or may readily be converted to expel a projectile by the action of an explosive"); *United States v. Westerdahl*, 945 F.2d 1083, 1088 (9th Cir. 1991) ("Possession of a toy or replica gun cannot sustain a conviction under § 924(c)."); *cf. United States v. Jones*, 222 F.3d 349, 351–52 (7th Cir. 2000) (analyzing whether evidence was sufficient to show the defendant's gun was not a "BB" gun). So the question is whether the government presented sufficient evidence from which the jury could have concluded beyond a reasonable doubt that Amaya's gun was real. We conclude the answer is yes.

First, there is the obvious fact that Amaya was an admitted member of a violent street gang. Consistent with the gang rules, former members Milton Shanna and Ruben Caquias testified that Latin Kings carried real guns, not fake ones, and were required to do so when in the territory of a rival gang (as Amaya was for the September meeting). It would not have been unreasonable for the jury to think it unlikely that a Latin King carried a fake gun to a drug deal in rival territory because doing so seems pointless, if not reckless.

Further, Sergeant Koren—who testified that Amaya's gun "had a slide and a magazine that went in the bottom," and "looked to have the weight and feel of a handgun"—was not a lay witness. He was a veteran law-enforcement officer with experience investigating drugs, gangs, and guns. He testified that the gun was displayed less than one foot from his face and that he was *positive* it was a real gun. Koren also testified that Amaya pointed the gun toward the alley, referenced rival gang members in the area, and said "they all right here," and "I be waiting for their asses," suggesting the gun would be used if necessary.

Then, during the *November* deal, Amaya was recorded talking about the gun he had displayed to Sergeant Koren during the *September* deal.[2] He said that he had gotten rid of it because some "boys in the hood" had "used it." Amaya argues that "used" does not necessarily mean *fired*, which would prove the gun was real; "used" could mean "simply

---

[2] Amaya argues that the November statements do not specifically refer to a gun displayed *on September 28, 2010*, so they only support a finding that Amaya had a pistol "at some time in the past." But as Amaya's counsel admitted at oral argument, there was no other prior encounter between Amaya and Sergeant Koren.

holding a gun for amusement, or brandishing it for protection, or pulling the trigger." But that ignores the evidence—testimony from Sergeant Koren, Milton Shanna, and Ruben Caquias—that Latin Kings specifically got rid of guns that had been used *in shootings*, so that no gang member in the region would be caught with such a gun. Finally, after having mentioned that he had gotten rid of the gun, Amaya asked Koren and the two informants if they knew anyone that could get him handguns—he didn't ask for replacement fake guns.

Cumulatively, and viewed in the light most favorable to the government, this evidence supports the jury's conclusion that Amaya had a real gun. *Cf. United States v. Lawson*, 810 F.3d 1032, 1040 (7th Cir. 2016) (lay witness testimony about gun's appearance, along with testimony that possessor said "I have a gun," sufficient to support jury conclusion that gun was real); *United States v. Moore*, 25 F.3d 563, 568 (7th Cir. 1994) (lay witness testimony about guns' appearances and about the defendants' actions in emptying and cleaning the guns, along with video depicting the guns, sufficient to support jury conclusion that guns were real).

### 2. Sufficient Evidence of Possession "In Furtherance of" Drug Crime

Amaya's conviction under § 924(c) also requires some connection between his gun and his drug crime. 18 U.S.C. § 924(c) (criminalizing possessing guns "in furtherance of" drug crimes); *United States v. Eller*, 670 F.3d 762, 765 (7th Cir. 2012) ("The 'in furtherance of' element of § 924(c) requires that the weapon further, advance, move forward, promote or facilitate the drug-trafficking crime, and that the possessed gun further a drug-trafficking offense by providing the dealer, his stash, or his territory with protection."); *United States v. Castillo*, 406

F.3d 806, 824 (7th Cir. 2005) ("924(c)(1)(A) was intended to reach weapons that actually facilitate crimes and not those innocently possessed in the vicinity").

Amaya argues that the evidence was insufficient to connect his gun to drug trafficking. When analyzing such a challenge, our role "is limited to ensuring that a valid legal theory supports the conviction and that there is some evidence from which a rational jury could find in favor of that legal theory." *United States v. Duran*, 407 F.3d 828, 842 (7th Cir. 2005). One such "theory" is that gun possession furthers drug trafficking when a drug dealer possesses the gun to protect himself, his drugs, or his drug proceeds during and after a sale. *See Eller*, 670 F.3d at 765; *United States v. Huddleston*, 593 F.3d 596, 602 (7th Cir. 2010); *Duran*, 407 F.3d at 840; *United States v. Lomax*, 293 F.3d 701, 705 (7th Cir. 2002). To determine whether this theory is supported by evidence, it can be useful to consider certain factors, including: "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Huddleston*, 593 F.3d at 602. While these factors may be useful, they are not dispositive and are not to be applied rigidly; instead, "we are guided primarily by common sense." *Id*.; *see also Castillo*, 406 F.3d at 815; *Duran*, 407 F.3d at 840.

Amaya notes that there was no evidence that the gun was loaded. He also argues that the gun could not have furthered the September drug deal because that deal was among friendly fellow gang members and outside of public view, so no participant would have felt endangered. Amaya admits

that he carried the gun for protection against an attack from rival gang members, but argues that any such attack would have been prompted only by his membership in the Latin Kings, not by his drug sales in rival territory. Such needle-threading is misplaced at this stage of the case. We view the evidence in the government's favor and we "will overturn the verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Morales*, 655 F.3d at 634. And the record contains plenty of evidence from which a jury could have found Amaya guilty.

First, Amaya's gun was a handgun, which "easily could be concealed and carried to drug transactions." *Huddleston*, 593 F.3d at 602. Moreover, Amaya *actually did* carry it with him to a drug transaction, and we have held that "a fact finder is certainly entitled to come to the common-sense conclusion that when someone has both drugs and a firearm on their person, the gun is present to further drug trafficking." *Lomax*, 293 F.3d at 706; *Duran*, 407 F.3d at 841 ("[J]urors are entitled to consider that drug dealers possess guns for protection to further drug-trafficking offenses."). *See also Huddleston*, 593 F.3d at 602 ("[T]he drug activity at issue—distribution—might reasonably call for the use of a weapon for protection, both during the drug deals and afterward to protect the remaining stash and profits."). Finally, while conducting his drug sale, Amaya pointed the gun toward the alley, referenced rival gang members in the area, and said "they all right here," and "I be waiting for their asses," which a jury could have concluded indicated Amaya's willingness to *use* the gun to protect his drugs or money. This evidence, viewed in the government's favor, adequately supports the jury's verdict.

### 3. Not Abuse of Discretion to Admit Statements Made After Amaya Exited Car

#### i. Relevant Facts

The September drug deal was audio recorded. (There is video too but the equipment wasn't suitable for nighttime recording, so nothing can be seen.) While Amaya was in the car, Sergeant Koren did not say anything about Amaya having a gun. But as soon as Amaya left, Koren said, "Yea. Mother f***er had a pistol," to which an informant responded, "That was a big ass pistol," prompting Koren to respond, "Hell yea." Before trial, Amaya moved to exclude these statements and the government agreed not to introduce them.

At trial, Sergeant Koren testified that Amaya brandished his gun less than a foot from Koren's face. Amaya's lawyer thought the jurors might not believe Koren if they knew that he didn't say anything about a gun while Amaya was in the car. (Counsel's theory was that if Amaya really displayed a gun, Koren would have said something immediately, because he would have been fearful and because he would want to prompt Amaya to say something incriminating while he was being recorded.) So on cross-examination, the following testimony was elicited:

Q:     And yet, despite the fact that you are aware that your vehicle is equipped with recording equipment, you don't say anything about the gun; is that right?

A:     Not at that instant, no.

Q:     At that instant, when there is a firearm brandished a foot from your head, you don't say, "Hey, that's a big gun," do you?

A:     Not at that instant, no.

At a sidebar, the government contended and the judge concluded that Amaya's lawyer had "opened the door" to what was said as soon as Amaya left the car. So the following exchange occurred on redirect:

Q:     What is the first thing you said when the defendant stepped out of that car?

A:     I said, "Yeah. Motherf***er had a pistol."

Q:     What did the [informant] say in response?

A:     He said, "That was a big-ass pistol."

…

Q:     Why did you say that?

A:     It was a significant event. It's just—you know, after he got out of the car, it was like, take a deep breath, and that's what came out of my mouth.

The moments leading up to the exchange of $380 for a half-ounce of cocaine, he pulls out a gun. For a split second I wasn't sure if I was being robbed or what was going on. So that's the first thing that blurted out of my mouth when he got out of the car.

Q:     You said, "take a deep breath." What were you feeling at that point?

> A:    I was scared. I mean, there was a gun
>        from a gang member within inches of my
>        face.

Notably, Sergeant Koren was not asked on redirect about his response ("Hell Yea.") to the informant's statement, but that response came in when the government played the audio tape shortly after Koren's testimony.

### ii.   Analysis

The district court concluded that the post-exit statements were admissible because Amaya had "opened the door." As we explained in *Villegas*:

> When a party opens the door to evidence that would be otherwise inadmissible, that party cannot complain on appeal about the admission of that evidence … . However, where the rebuttal evidence does not directly contradict the evidence previously received, or goes beyond the necessity of removing prejudice in the interest of fairness, it is within the district court's discretion to deny its admittance. Indeed, the open door doctrine's soundness depends on the specific situation in which it is used and thus calls for an exercise of judicial discretion.

655 F.3d at 672 (citations and quotation marks omitted).

Amaya's lawyer attacked the credibility of Sergeant Koren's testimony that Amaya displayed a gun, making Koren fearful. Counsel painted that story as implausible, given that Koren did not *say* anything about a gun at the instant it was allegedly displayed. It was not an abuse of discre-

tion for the district court to conclude that this line of questioning opened the door to evidence that both Koren and the informant *did* say something, *shortly after* the gun was displayed and Amaya exited the car.[3]

Next, concerning the informant's statement (but not Koren's), Amaya argues that admitting the statement violated the Confrontation Clause of the Sixth Amendment because the informant did not testify at trial. The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. "Witnesses" are those who "bear testimony," *Crawford v. Washington*, 541 U.S. 36, 51 (2004), so that "[a]dmitting a witness's out-of-court testimonial statements when that witness is available to testify violates the accused's Sixth Amendment right of confrontation, but not when those statements are offered for a purpose other than establishing the truth of the matter asserted." *United States v. Gaytan*, 649 F.3d 573, 580 (7th Cir. 2011) (quotation marks omitted). So we must ask whether the informant's statement was offered for its truth; if so, we must also ask whether it was "testimonial."

The government argues that the informant's statement—"That was a big-ass pistol"—wasn't offered for its truth, it was offered merely to put Sergeant Koren's response—"Hell yea"—in context. But as we explained in *United States v. Smith*,

---

[3] Amaya's appellate counsel, who was also his trial counsel, informed us at oral argument that she knew she was "very close to the line," and that she made a strategic decision to proceed, without asking for a sidebar, despite the known risk of opening the door.

816 F.3d 479, 481–82 (7th Cir. 2016), whether a statement is offered for "context" is beside the point—the relevant question is whether the statement is offered for its truth (and the answer to that question can be yes, even if the statement provides context for some other, admissible statement). An example from *Smith*—a public-corruption case—is helpful. "[Informant]: Last week I paid you $7,000 for a letter that my client will use to seek a grant for a daycare center. Do you remember? [Defendant]: Yes." *Id*. at 482. The defendant's statement is admissible, Fed. R. Evid. 801(d)(2)(A), but the informant's is not. Though it puts the defendant's statement in context, it only does so (and is only relevant) if the informant was speaking the truth. The case before us is similar: the informant's "That was a big-ass pistol" only puts Koren's "Hell yea" in context and is only relevant if the informant was speaking the truth.

We also note that the government's "context" argument is strange given that the prosecutor elicited the informant's statement *but did not* elicit Koren's response. Nothing could put Koren's "Hell yea" in context for the jury because the jury didn't know those words had been uttered. And even if we accept the government's explanation—that the informant's statement *was* introduced to provide context for Koren's response, but the prosecutor simply forgot to introduce the response—we would have a hard time understanding why "Hell yea" needed to be introduced and put in context. The introduction of Koren's initial statement ("Yea. Mother f***er had a pistol.") adequately undercut Amaya's lawyer's inference that Koren had remained silent, suggesting no gun existed. "Hell yea" served no additional purpose. *Cf. Adams*, 628 F.3d at 417 (finding statement offered for truth where "there was no need to introduce the statements for context").

In any event, we find that the Confrontation Clause was not violated because the informant's statement was not "testimonial" (an issue on which the parties' briefs are silent). A statement is testimonial "when the circumstances objectively indicate that … the primary purpose … is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006); *Gaytan*, 649 F.3d at 580; (statement is testimonial if made "in anticipation of or with an eye toward a criminal prosecution"). "Where no such primary purpose exists," the Confrontation Clause is not implicated. *Michigan v. Bryant*, 562 U.S. 344, 359 (2011).[4] We determine the "primary purpose" of a statement by conducting "[a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties to it." *Id*. at 360. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id*.

In *Gaytan*, we had "no doubt" that an informant's statements were testimonial where they were made during a conversation with the defendant that the informant knew was being recorded to obtain evidence against the defendant. 649

---

[4] Dealing with the situation before it, the *Davis* court wrote that a statement is *non*-testimonial when its primary purpose was "to enable police assistance to meet an ongoing emergency." 547 U.S. at 822. But in *Bryant*, the Court clarified that a statement is non-testimonial so long as it was *not* "procured with a primary purpose of creating an out-of-court substitute for trial testimony," and that "there may be other circumstances, aside from ongoing emergencies," where that is the case. 562 U.S. at 358; *see also Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015).

F.3d at 579. The informant was wired and specifically sent by law enforcement to engage in a controlled buy of narcotics from the defendant. A reasonable person in that position would have known that the conversation was likely to be used to prosecute the defendant, so the statements were testimonial.

The situation here is different. A reasonable informant would not have said, "That was a big ass pistol," to prompt Amaya into saying something admissible, because Amaya had already left the car. *Cf. Bryant*, 562 U.S. at 365–66 (a single conversation can "evolve" or "transition" between testimonial and non-testimonial) (citing *Davis*, 547 U.S. at 828). Nor would a reasonable informant have been trying to inform Sergeant Koren that Amaya had a gun, because Koren witnessed everything that the informant did. Perhaps the informant sought to lighten the tense mood; or perhaps, like Koren, he simply "blurted out" a statement about a startling event. *Cf. Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); *Bryant*, 562 U.S. at 361–62 (comparing "excited utterances" in hearsay law to non-testimonial statements); *id*. at 377 (the informality of a conversation weighs against finding a statement is testimonial); *Clark*, 135 S. Ct. at 2180 (same). We need not say with certainty what the purpose *was*; indeed, there may have been "no discernible purpose at all." *Clark*, 135 S. Ct. at 2182. Because our objective analysis confirms that the informant's statement *was not* made to "establish or prove past events," *Davis*, 547 U.S. at 822, it was non-testimonial and there was no Confrontation Clause violation. The government argued that any Confrontation Clause violation was harmless because of the overwhelming evidence that Amaya had a gun.

Amaya did not respond to that argument. In any event, because we find no violation, we do not discuss the harmless-error analysis.

### B. Racketeering

#### 1. Sufficient Evidence of Violent Assault to Maintain Amaya's Position

Amaya argues that the evidence was insufficient to convict him on Count II, which charges him with violating 18 U.S.C. § 1959(a)(3) due to his role in punishing two Latin Kings who had broken the gang rule that prohibited stealing within gang territory. The statute criminalizes "assault with a dangerous weapon" committed "for the purpose of … maintaining or increasing position in an enterprise engaged in racketeering activity." Amaya argues: (1) he did not participate in the assault; or (2) if he did, it was not to maintain or increase his position within the Latin Kings.

Amaya's arguments are unpersuasive. Recall that we view the evidence "in the light most favorable to the government" and we "overturn the verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Morales*, 655 F.3d at 634 (citation and quotation marks omitted). As to Amaya's participation, fellow gang member Ruben Caquias, who was present, testified that Amaya oversaw the assault. According to Caquias, Amaya recommended the punishment (hand-smashing), chose the weapon (hammer or brick, not baseball bat), picked the assailant (gang member "Baby28"), and made Caquias watch the assault and report back. Also in evidence were recordings of Amaya telling Caquias that a

hammer or a brick should be used and later reassuring an-
other gang member that a brick would work. Milton Shanna,
another Latin King who was present, also said that Amaya
was present and oversaw the assault. This evidence was suf-
ficient to support the jury's conclusion that Amaya partici-
pated in the assault.

Amaya argues that even if he participated in the assault,
the evidence was insufficient to show that he did so to main-
tain or increase his position in the gang. Noting that the Co-
rona had initially ordered more severe beatings, and Amaya
talked him down to mere hand-smashing, Amaya argues that
"challenging the judgment of the highest ranking officer"
could not possibly have served to maintain or increase
Amaya's position. We reject the implied proposition—that ex-
pressing disagreement with one's boss can never be a part of
doing one's job. Moreover, Amaya frames the issue incor-
rectly. The assault underlying Amaya's conviction was the
hand-smashing, so the jury's job was to determine why
Amaya participated in the hand-smashing, not why he op-
posed participating in a more brutal assault. There was evi-
dence that gang rules required beatings for members who
stole within gang territory. And both Caquias and Shanna tes-
tified that the hand-smashing was to enforce gang rules, and
that Amaya was charged with overseeing the assaults specifi-
cally because he was the Regional Inca where the theft had
taken place. This evidence supports a conclusion that Amaya
participated "because he knew it was expected of him by rea-
son of his membership" in the gang. *United States v. DeSilva*,
505 F.3d 711, 715 (7th Cir. 2007). Amaya urges a different con-
clusion: that he participated in the assault to save the thieves'
lives. (The reasoning is that, had Amaya not participated, the
Corona would have imposed a more severe punishment and

the thieves may have been killed.) But as we said in *DeSilva*, "[a]lthough it is possible to speculate as to alternative motives for the order, as [Amaya] would have us do, that is not our role. The only question is whether a rational jury could have found that motive beyond a reasonable doubt, and we agree with the district court that the evidence was sufficient to support that determination." *Id*. at 716. So we affirm the jury's verdict.

## 2. Sufficient Evidence of Conspiracy to Participate in Pattern of Racketeering Activity

Finally, Amaya argues that the evidence was insufficient to convict him on Count I, which charged him with violating 18 U.S.C. § 1962(d), part of the Racketeering Influenced and Corrupt Organizations Act. As relevant here, the statute criminalizes conspiring to "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §§ 1962(c)–(d). "Racketeering activity" is defined in 18 U.S.C. § 1961(1) and includes murder, attempted murder, extortion, and drug trafficking. A "pattern" of racketeering activity requires at least "two predicate acts of racketeering committed within a ten-year period." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 659 (7th Cir. 2015); 18 U.S.C. § 1961(5).

Because Amaya was charged under a conspiracy theory, the government was required to prove he agreed both: (1) that he would conduct or participate in the affairs of the Latin Kings; and (2) that some gang member(s) would commit at least two predicate acts of racketeering. *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014). Only the second agreement is contested. The government was required to prove that Amaya "agreed that a member of the conspiracy

would commit two predicate racketeering acts," but not that Amaya "agreed to commit the predicate crimes personally," *Volpendesto*, 746 F.3d at 284 (citations and quotations omitted), nor even that "any such acts were ultimately committed by anyone … ." *United States v. Tello*, 687 F.3d 785, 792 (7th Cir. 2012).

Amaya argues that the government relied heavily at trial on the rules governing the Latin Kings and in particular the Latin Kings in the Little Village neighborhood, but failed to show that Amaya himself actually agreed to abide by those rules. Pressing that argument, Amaya notes there was evidence that gang members did not always follow all of the rules. But Amaya ignores that two former Latin Kings—again, Caquias and Shanna—testified that Amaya, as Regional Inca, was in charge of *enforcing* the rules. The jury was entitled to credit that testimony and conclude that Amaya agreed to the rules. *See Garcia*, 754 F.3d at 471 (considering "documentary evidence of the gang's rules" as evidence that the Latin Kings' Corona participated in a RICO conspiracy). The rules mandated the shooting of trespassers, killing of police cooperators, retaliatory shooting of rival gang members, and beatings of Latin Kings who broke the rules. And though Amaya argues there were instances in which gang members failed to follow the rules, he ignores the evidence of instances in which the rules *were* followed. In particular, Amaya took credit for twenty-six shootings of rival gang members that took place while he was Regional Inca.

Further, there is the extortion of the "miqueros." The evidence was that the extortion was a gang activity, carried out by gang members and overseen by superiors like Amaya. Amaya argues that the extortion did not advance the gang's

affairs because the money went to the family of an imprisoned gang member, not to the gang's general coffers. Not surprisingly, Amaya cites no authority to support this argument. The jury could have concluded that sending money to the family of an imprisoned member furthered the gang's affairs by encouraging imprisoned members to remain loyal, rather than cooperate with prosecutors.

Finally, there is drug trafficking. Many gang members sold drugs and were permitted to do so by gang rules. The gang also regulated the drug trade, prohibiting credit transactions if the debt could not be repaid, and resolving disputes among members that arose out of drug sales. Some money received from drug sales was given to the gang in the form of mandatory dues, and members with lucrative drug-dealing operations were allowed to skip the "mandatory bust outs" if they chipped in extra money. Amaya, as Regional Inca, ensured the dues were collected and announced a plan to redistribute the money to ensure each chapter had adequate resources, even those with smaller memberships.

This evidence—concerning the shootings, the extortion, and the drug-dealing—was sufficient to support Amaya's RICO conspiracy conviction.

### III. CONCLUSION

We AFFIRM Amaya's convictions.